COPY

IN THE UNITED STATES DISTRICT COURT

FOR THE ___MIDDLE___ DISTRICT OF TENNESSEE

_____ DIVISION

| | |
|---|---|
| __Mr. Tyree Smith__ Name | ) ) ) |
| Prison Id. No. _268325_ | ) |
| __Mr. Marcus Wright__ Name | ) ) |
| Prison Id. No. _460159_ | ) ) |
| (Plaintiff(s)) | ) |

(List the names of all the plaintiffs filing this lawsuit. Do not use "et al." Attach additional sheets if necessary.

Civil Action No. _____
(To be assigned by the Clerk's office. Do not write in this space.)

**RECEIVED**

APR - 8 2015

**U.S. DISTRICT COURT**
**MIDDLE DISTRICT OF TN.**

Jury Trial ☑ Yes ☐ No

v.

| | |
|---|---|
| __C/O J. Champaco__ Name | ) ) |
| __C/O T. Perkins__ Name | ) ) |
| (Defendant(s)) | ) ) |

(List the names of all defendants against whom you are filing this lawsuit. Do not use "et al." Attach additional sheets if necessary.

**COMPLAINT FOR VIOLATION OF CIVIL RIGHTS**
**FILED PURSUANT TO 42 U.S.C. § 1983**

I.   PREVIOUS LAWSUITS (The following information must be provided by each plaintiff.)

   A.   Have you or any of the other plaintiffs in this lawsuit filed any other lawsuits in the United States District Court for the Middle District of Tennessee, or in any other federal or state court?

   ☐ Yes   ☑ No

   B.   If you checked the box marked "Yes" above, provide the following information:

      1.   Parties to the previous lawsuit:

         Plaintiffs   _____Not Applicable_____

         Defendants   _____

1

**Plaintiffs**

1. Mr. Tyree C. Smith #268325

2. Mr. Marcus Wright #460159

3. Mr. Charles Nelson #370992

4. Mr. Courtney Stroggins #370295

5. Mr. Michael Walker #427022

6. Mr. Ernest Fitzgerald #446498

7. Mr. Robert Hobson #402758

8. Mr. Bruce Matthews #458505

9. Mr. David Moore #433008

## Defendants

**1.** C/O J. Champaco

2. C/O T. Perkins

3. (Former) Cpl. F. Estes

4. (Former) C/O M. Spencer

5. C/O S. Morris

6. Sgt. Julia Campbell

2. In what court did you file the previous lawsuit? **Not Applicable**

_____

(If you filed the lawsuit in federal court, provide the name of the District. If you filed the lawsuit in state court, provide the name of the state and the county.

3. What was the case number of the previous lawsuit? **Not Applicable**

4. What was the Judge's name to whom the case was assigned? **Not Applicable**

_____

5. When did you file the previous lawsuit? **N/A** _____ (Provide the year, if you do not know the exact date.)

6. What was the result of the previous lawsuit? For example, was the case dismissed, appealed, or still pending? **Not Applicable**

_____

7. When was the previous lawsuit decided by the court? **N/A** _____ (Provide the year, if you do not know the exact date.)

8. Did the circumstances of the prior lawsuit involve the same facts or circumstances that you are alleging in this lawsuit.

☐ Yes          ☐ No

(If you have filed more than one prior lawsuit, list the additional lawsuit(s) on a separate sheet of paper, and provide the same information for the additional lawsuit(s).)

II. THE PLAINTIFF'S CURRENT PLACE OF CONFINEMENT (The following information must be provided by each plaintiff.)

(A.) What is the name and address of the prison or jail in which you are currently incarcerated? R.M.S.I., 7475 Cockrillbend Blvd. Nashville, Tn. 37209

B. Are the facts of your lawsuit related to your present confinement?

☐ Yes          ☑ No

C. If you checked the box marked "No" in question II.B above, provide the name and address of the prison or jail to which the facts of this lawsuit pertain.

DSNF, 7575 Cockrillbend Blvd. Nashville, Tn. 37243-0469

D. Do the facts of your lawsuit relate to your confinement in a Tennessee State Prison?

☑ Yes          ☐ No

If you checked the box marked "No," proceed to question II.H.

E. If you checked the box marked "Yes" in question II.D above, have you presented these facts to the prison authorities through the state grievance procedure?

☑ Yes          ☐ No

F. If you checked the box marked "Yes" in question II.E above:

1. What steps did you take? Finally ADMINISTRATIVE REMEDIES EXHAUSTED ALL THE WAY TO LEVEL 3.

2. What was the response of prison authorities? THE COMMISSIONER CONCUR WITH THE WARDEN RESPONSE

G. If you checked the box marked "No" in question II.E above, explain why not. _____
N/A

H. Do the facts of your lawsuit pertain to your confinement in a detention facility operated by city or county law enforcement agencies (for example, city or county jail, workhouse, etc.)?

☐ Yes          ☑ No

I. If you checked the box marked "Yes" in question II.H above, have you presented these facts to the authorities who operate the detention facility?

☐ Yes          ☑ No

J. If you checked the box marked "Yes" in question II.I above:

1. What steps did you take? _____ N/A _____

2. What was the response of the authorities who run the detention facility? _____
N/A

L. If you checked the box marked "No" in question II.I above, explain why not. _____
N/A

Attach copies of all grievance related materials including, at a minimum, a copy of the grievance you filed on each issue raised in this complaint, the prison's or jail's response to that grievance, and the result of any appeal you took from an initial denial of your grievance.

(III.) PARTIES TO THIS LAWSUIT

A. Plaintiff(s) bringing this lawsuit:

1. Name of the first plaintiff: _____ Mr. Tyree Smith _____

Prison Id. No. of the first plaintiff: _____ #268325 _____

Address of the first plaintiff:   R.M.S.I., 7475 Cockrillbend Blvd.
Nashville, Tn. 37209
· (Include the name of the institution and mailing address, including zip code.
If you change your address you must notify the Court immediately.)

2.    Name of second the plaintiff:   Mr. Marcus Wright

Prison Id. No. of the second plaintiff:   # 460159

Address of the second plaintiff:   R.M.S.I., 7475 Cockrillbend Blvd.
Nashville, Tn. 37209
(Include the name of the institution and mailing address, including zip code.
If you change your address you must notify the Court immediately.)

If there are more than *two* plaintiffs, list their names, *prison identification
numbers, and addresses on a separate sheet of paper.*

B.)    Defendant(s) against whom this lawsuit is being brought:

1.    Name of the first defendant:   C/O J. CHampaco

Place of employment of the first defendant:   DSNF

The first defendant's address:   7575 Cockrillbend Blvd.
Nashville, Tn. 37209

Named in official capacity?        ☑ Yes        ☐ No
Named in individual capacity"      ☑ Yes        ☐ No

2.   Name of the second defendant:   C/O T. Perkins

· Place of employment of the second defendant:   DSNF

The second defendant's address:   7575 Cockrillbend Blvd.
Nashville, Tn. 37209

Named in official capacity?        ☑ Yes        ☐ No
Named in individual capacity"      ☑ Yes        ☐ No

If there are more than *two defendants* against whom you are bringing this
lawsuit, you must list on a separate sheet of paper the name of each additional
defendant, their place of employment, their address, and the capacity in which
you are suing them.  If you do not provide the names of such additional
defendants, they will not be included in your lawsuit.  If you do not provide
their proper name, place of employment, and address, the Clerk will be
unable to serve them should process issue.

**Plaintiff**

Mr. Charles Nelson #370992 (Discharged)

7575 Cockrill bend Blvd.

Nashville, Tn. 37209

**Plaintiff**

Mr. Courtney Stroggins #370295 (Discharged)

7475 Cockrill bend Blvd.

Nashville, Tn. 37209

**Plaintiff**

Mr. Michael Walker #427022 (Discharged)

7475 Cockill bend Blvd.

Nashville, Tn. 37209

**Plaintiff**

Mr. Ernest Fitzgerald #446498 (Discharged)

7475 Cockrill bend Blvd.

Nashville, Tn. 37209

**Plaintiff**

Mr. Bruce Matthews #458505

7475 Cockrill bend Blvd.

Nashville, Tn. 37209

**Plaintiff**

Mr. Demario Driver #417678

7177 Cockrill bend Blvd.

Nashville, Tn. 37209

**Plaintiff**

Mr. David Moore #433008 (Deceased)

480 Green Chapel Road

Henning, Tn. 38041

**Defendant**

(Former) Cpl. F. Estes

7575 Cockrill bend Blvd.

Nashville, Tn. 37209

**Defendant**

(Former) C/O M. Spencer

7575 Cockrill bend Blvd.

Nashville, Tn. 37209

**Defendant**

C/O S. Morris

7575 Cockrill bend Blvd.

Nashville, Tn. 37209

**Defendant**

Sgt. Julia Campbell

7575 Cockrill bend Blvd.

Nashville, Tn. 37209

For the ~~District Court Clerk's~~ office.

# WITNESS STATEMENT COPY

ME And MR. Courancy STReggins Did Engage into a Physical Altercation with Each Other At D.S.N.F. on 3.28.1

MR. Marcus wright and MR. Charles Nelson Engaged into a Physical Altercation with Each Other As well At D.S.N.F. on 3.28.12. Cb T. PERkins And Cb J. Champaco Allowed All the 4 of us to do so! Thank You!

Mr. Tyree Smith #268325

To: The District ~~Court Clerk's~~ office.

'Witness statement'

C/O T. Perkins and C/O J. Champaco allowed me and Ernest Fitzgerald
to fight each other in the Rec Reation yard at DS DeBerry special needs
on 4/18/12
   Brian Mathews #458505

To the District Court Clerk's office.

# Witness Statement

C/O T Perkins and C/O J. Chaupoco did allow me and Charles Nelson to fight each other at special needs on 3-28-2012. They also allowed Tyree smith and courtney Stroggui to fight each other to.

Marcus Wright
#460159

M Wright

To The District court Clerk's office.

# WITNESS STATEMENT

CPl. F. Estes and C.O. T. Perkins allowed me and Robert Hobson to fight each other at Special Needs between 12·1·11 and 12·31·11 between 2:30 pm and 4:00 pm.

C.O. T. Perkins and C.O. M. Spencer did allow me and E. Fitzgerald to fight each other at special needs between 10:14·11 and 12·1·11 between 2:00 pm and 4:00 pm

Michael Walton
#427022

↑
Upon iformation and Belief,
Mizyre Smith #268325

# WITNESS STATEMENT

● C/O T. Perkins and "Resigned" C/O M. Spencer did allow me and max prisoner Micheal Walker to go toe to toe with each other in the rec cage area at D.S.N.F.C Between 10·14·11 and 1·30·11 between 2:15 pm and 4:00 pm 2nd shift 7-F Rec area D.S.N.

● C/O T. Perkins and C/O J. Champaco did allow me and max prisoner Bruce Matthews to Go toe to toe with each other in the rec cage area at D.S.N.F (4·8·12 About 2:45 pm 2nd 7-F Rec Area D.S.N.F)

4·18·12

Ernest Fitzgerald #446498



I (we) hereby certify under penalty of perjury that the above complaint is true to the best of my (our) information, knowledge and belief.

Signed this _____ day of _____, 20**13** .

(1.) Signature: x _Shawn Johnson_

Prison ID Number: x _294835_

Address: x _7575 Cockrillbendblvd_

_Nashville, Tn. 37209-1057_
(Include city, state and zip code)

(2.) Signature: _____

Prison ID Number: _____

Address: _____

_____
(Include city, state and zip code)

(3.) Signature: x _James Wood_

Prison ID Number: x _425812_

Address: x _7575 Cockrill Bend Blvd._

_Nashville, TN 37209 - 1056_
(Include city, state and zip code)

ALL PLAINTIFFS <u>MUST SIGN</u> THE COMPLAINT. If there are more than three plaintiffs, attach additional signatures with prison identification numbers and addresses.

1. NAME and T.D.O.C. number:
   ADDRESS And Zip Code:
. Name and T.D.O.C. number:
   ADDRESS And Zip Code:
. Name And T.D.O.C. number: Ronald Greene 110142 Ronald Greene
   ADDRESS And Zip Code: 7575 Cockrill Bend Rd 37209
. Name and T.D.O.C. number:
   ADDRESS And Zip Code:
   Name and T.D.O.C. number:
   ADDRESS And Zip Code:
   Name And T.D.O.C. number:
   ADDRESS And Zip Code:
) Name And T.D.O.C. number:
   ADDRESS And Zip Code:
. Name And T.D.O.C. number:
   ADDRESS And Zip Code:
1. Name And T.D.O.C. number:
   ADDRESS And Zip Code:
3) Name And T.D.O.C. number: Tammy Lee Hollifis - 00413338
   ADDRESS And Zip Code: 75.75 Cockrill bend Unid 37209
4) Name and T.D.O.C. number:
   ADDRESS And Zip Code:
5. Name And T.D.O.C. number:
   ADDRESS And Zip Code:
6) Name and T.D.O.C. number: Equilius Bolton Equilius Bolton #449343
   ADDRESS And Zip Code: D.Sne 7575 Cockrill Bend Blvd 37209
7) Name and T.D.O.C. number:
   ADDRESS And Zip Code:
8) Signature And T.D.O.C. number: DeMARIO DRIVER LaMario Driver # 417167B
   ADDRESS And Zip Code: 7575 COCKRIIL BEND Blvd Nashville TN, 37209

|  | | Address And Zip Code: |
|---|---|---|
| Dr. M. | 18. | Signature And T.D.O.C. number: |
|  | | Address And Zip Code: 7575 Cockrill bend blvd nash Tn 3720 |
|  | (19) | Signature And T.D.O.C. number: — Marcell Wright 460159 |
|  | | Address And Zip Code: |
| E.N. | 21. | Signature And T.D.O.C. number: |
|  | | Address And Zip Code: |
|  | 22. | Signature And T.D.O.C. number: Mr. Tyree Smith #268335 |
|  | | Address And Zip Code: 7575 Cockrill Bend Blvd. Nashville, Tn 37209 |
| E.S. | 23 | Signature And T.D.O.C. number: |
|  | | Address And Zip Code: |
| N.W. | 24 | Signature And T.D.O.C. number: Michael Walker 427022 |
|  | | Address And Zip Code: 7575 Cockrill Bend Blvd Nashville, TN 37209 |
| R.H. | 25. | Signature And T.D.O.C number: Michael Walber 427022 |
|  | | Address And Zip Code: |
| E.M. | 26. | Signature And T.D.O.C.number: Bruces Mathews, 458505 |
|  | | Address And Zip Code: 7575 COCKRILL Bend Blvd Nashville, TN 37209 |
| E.F. | 27. | Signature And T.D.O.C number: Ernest Fitzgerald 446498 |
|  | | Address And Zip Code: 7575 Cockrill Bend Blvd Nashville, TN 37209 |
| D.O. | 28. | Signature And T.D.O.C number: |
|  | | Address And Zip Code: |
| N.M. | 29. | Signature And T.D.O.C number: |
|  | | Address And Zip Code: |
| D.S. | 30. | Signature And T.D.O.C number: |
|  | | Address And Zip Code: |
| H.W. | 31. | Signature And T.D.O.C number: |
|  | | Address And Zip Code: |
| D.E. | 32. | Signature And T.D.O.C number: |
|  | | Address And Zip Code: |

33. Signature and T.D.O.C number:

ADDRESS and Zip Code:

34. Signature and T.D.O.C number:

ADDRESS and Zip Code:

35. Signature and T.D.O.C number:

ADDRESS and Zip code:

36. Signature and T.D.O.C number: Chris Greene #437648

ADDRESS and Zip code: MCCX PO Box 2000 Wartburg, TN 37887

37. Signature and T.D.O.C number:

ADDRESS and Zip code:

10099

**✳ Remedies Exhausted ✳**
↓
"Finally"

COPY



**STATE OF TENNESSEE**
**DEPARTMENT OF CORRECTION**
**6ᵀᴴ FLOOR RACHEL JACKSON BUILDING**
**320 SIXTH AVENUE NORTH**
**NASHVILLE, TENNESSEE 37243-0465**
OFFICE (615) 741-1000 EXT. 8180 • FAX (615) 253-1668

## MEMORANDUM

Inmate Name: _Tyree Smith_    TDOC Number: _268325_

Institution: _RMSI/SPND_    Housing Unit: _4-D-202_

Institution Grievance Number: _13-0023_    TOMIS Grievance Number: _257204_

Commissioner's Response and Reasons:

The established procedures for the expression and resolution of inmate complaints are outlined in Policy # 501.01. Inmate Smith # 268325 has failed to demonstrate that the staff at SPND are not in compliance with this policy, therefore no other actions will be taken at this time.

☒ Concur with Warden    ☐ Concur with Supervisor    ☐ Appeal Denied

_4-9-13_
**Date**

_Jim Crosby_ (?)
**Deputy Commissioner of Operations**

DS-Oth2



RECEIVED
4.19.13
B-Shift
1-B #11 CELL
Simmons



1009

4-D-202

## TENNESSEE DEPARTMENT OF CORRECTION
## INMATE GRIEVANCE RESPONSE

13-0023/0025 7704

| Tyree Smith | 268385 | SPND\RMSI | 0025-7704 |
|---|---|---|---|
| NAME | NUMBER | INSTITUTION & UNIT | GRIEVANCE NUMBER |

Summary of Evidence and Testimony Presented to Committee  Read grievance and supervisor response. Hearing held in absentia due to grievant at RMSI.

Inmate Grievance Committee's Response and Reasons  Concurred with the supervisor response. No further action is recommended.

3-19-13
DATE

CHAIRMAN

MEMBER

MEMBER

MEMBER

MEMBER

Warden's Response:   Agrees with Proposed Response    ☒

Disagrees with Proposed Response    ☐

If Disagrees, Reason(s) for Disagreement _____

Action Taken: _____

DATE: 3/20/2013   WARDEN'S SIGNATURE: Jewel Steele

Do you wish to appeal this response? Absolutely!!!!!!! YES _____  NO

If yes:   Sign, date, and return to chairman for processing.  Grievant may attach supplemental clarification of issues or rebuttal/reaction to previous responses if so desired.

Received

m: Tyree C. Smith    4-2-13   'APR 04 2013
GRIEVANT   DATE   WITNESS

RMSI Grievance Office

Commissioner's Response and Reason(s): _____

RECEIVED

APR 09 2013

TDOC Operations

DATE   SIGNATURE

Distribution Upon Final Resolution:
White - Inmate Grievant   Canary – Warden   Pink – Grievance Committee   Goldenrod - Commissioner

CR-1393 (Rev. 3-00)   RDA 2244

# D.S.N.F. Inmate Grievance Committee Hearing Minutes

**Date:** 03/19/13          **Time 8:30 am**

**Grievance #00257704_____**         **Cpl. Ty Parker**
                                        **Grievance Chairperson**

**Grievant Name and TDOC#**       **Harry D. Webb #306777**
Tyree Smith #268325                       **Grievance Clerk**

**__Natasha Holt_____**     **Tim Roberson #244376**
**Staff Committee Member**          **Inmate Committee Member**

**__CERT Cantrel_____**       **Jacque Bennett #216151**
**Staff Committee Member**          **Inmate Committee Member**

## Minutes

Chairperson:

Read the Grievance and supervisor response. Hearing held is absentia due to grievant at RMSI.

Grievant:

Committee:

The Committee concurred with the supervisor response. No further action is recommended.

Sgt. Ti. Leonard,                    1·8·13

   Please forward the Complaint with this
Kite to Sgt. Julia Campbell At D.S.N.F.!
Leonard, Real Talk, Give me a Response the
Very Same Day you forward my Complaint to
Sgt. Campbell. Please mane, Do that for me,
Real Talk! Holla Back!

                    Mr. Tyree Smith #268325
                    4-D #202 Cell

**✲ EXTREMELY URGENT ✲**



# TENNESSEE DEPARTMENT OF CORRECTION

## INMATE GRIEVANCE

(1)

MR. Tyree Smith
**NAME**

#268335
**NUMBER**

R.M.S.I. 4-D #202 Cell
**INSTITUTION & UNIT**

DESCRIPTION OF PROBLEM: I MR. Smith wish to file this complaint against Sgt. Julia Campbell. I MR. Smith filed a complaint against 20 staffs located at D.S.N.F. (11.8.12). I U.S. mailed the complaint to Sgt. Campbell at D.S.N.F. (11.8.12 9:12 p.m. R.M.S.I. 4-c #105 Cell). →

REQUESTED SOLUTION: I MR. Smith wish to Request for Sgt. Julia Campbell to send me a written Response regarding to my complaint against the 20 particular staffs located at D.S.N.F.! Thank You!

JAN 10 2013

mr. Tyree Smith
**Signature of Grievant**     RMSI Grievance Office     1.8.13
**Date**

:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

### TO BE COMPLETED BY GRIEVANCE CLERK

13-0083/0025 7704
**Grievance Number**

1-10-13
**Date Received**

CM
**Signature Of Grievance Clerk**

INMATE GRIEVANCE COMMITTEE'S RESPONSE DUE DATE: 2-2-13

AUTHORIZED EXTENSION: _____
**New Due Date**

_____
**Signature of Grievant**

:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

### INMATE GRIEVANCE RESPONSE

Summary of Supervisor's Response/Evidence: ~~See Sup.~~

2) Chairperson's Response and Reason(s): Sup. Response Rec'd
Grievance was Routed to SPND for Response
received 3-7-12

DATE: 3-7-12     CHAIRPERSON: G. Leonard     Received

Do you wish to appeal this response? ABSOLUTELY!!! YES _____ NO ~~MAR 3 1 2013~~     MAR 12 2013
DEFINITELY!!!     RMSI Grievance Office

If yes:     Sign, date, and return to chairman for processing within five (5) days of receipt of first-level response.

✓ mr. Tyree Smith
**GRIEVANT**

3.8.13
**DATE**

_____
**WITNESS**

Distribution upon final resolution:

White – Inmate Grievant     Canary – Warden     Pink – Grievance Committee     Goldenrod – Commissioner (if applicable)

CR-1394 (Rev. 3-00)

Case 3:15-cv-00402     Document 1     Filed 04/08/15     Page 31 of 92 PageID #: 31



**TENNESSEE DEPARTMENT OF CORRECTION**

**INMATE GRIEVANCE**        **(continuation sheet)**

(2)

DESCRIPTION OF PROBLEM: → However, Sgt. Campbell Refuse to give me any written Response regarding to my Particular Complaint by No means. It is Now Exactly 1·8·13. I forwarded a Brief written Request to Sgt. Campbell through Sgt. E. Leonard requesting for her to send me some Type of written Response regarding to my Complaint. Instead, I received copies once again in Return of 2 Previous Complaints of mines I filed against 2 Particular Staffs ("C/o J. Champaro and Cpl. J. Connell") right Before I was shipped from D.S.N.F. (12·26·12 7:12 p.m. 4-D #202 Cell). However, I wrote Another Brief written Request but Handed it Personally to warden Roland Colson through Cpl. J. white for him ("Colson") to forward it for me Directly to warden Jewel Steele ( 1·3·13 12:19 p.m. 4-D #202 Cell). Nevertheless though, I Have given Sgt. Campbell and the Firstline Supervisor ("Sgt. Eipson") a Very Good Reasonable Amount of Time to Process my Complaint through the Grievance Procedure and they have failed to give me Any Response. And I am Very Confident they have Received my Complaint through the mail As well. Due to the Very long Process (if Processed at All) of my Particular Complaint, I MR. Smith Hereby Consider the Particular Complaint of which I'm speaking of As A "Denial!" So Therefore I MR. Smith Definitely, Absolutely, Vigorously, Patiently, Ultimately and Mandatorily wish to file this Complaint Against Sgt. Julia Campbell by Each And Every means necessary! Thank You!

— End of Complaint —

Policy 501.01 (IV.) Policy 501.01 (V.I.)    Policy 501.01 (V.I.) Policy 501.01 (V.I.)
Page 1 of 9 (E)(H). Page 6 of 9 (C)(L)(2)(3). Page 2 of 9 (K)  Page 6 of 9 (N)(L).

West's T.C.A. Title 41   Policy
41·21·817 (A) (B)
41·21·806 (B)

**FEDERAL Rights Violation**
**Reprisal**

Duly Noted:

I MR. Smith will Allow and Permit 3 MAX Prisoners ("As witnesses") to Review this Particular Complaint Before I have it Deposited into the Grievance Box. It is Now Exactly 1·8·13. I will Deposite this Complaint to Sgt. E. Leonard for him to forward it Directly to Sgt. Julia Campbell.
(1) Catherine Lynn Quick-Champion #328286
(2) Charlie L. Levy #449049    (3) Christopher Greene #437648

Distribution upon final resolution:



# TENNESSEE DEPARTMENT OF CORRECTION
## RESPONSE OF SUPERVISOR OF GRIEVED EMPLOYEE OR DEPARTMENT

DATE: 2-21-13

Please respond to the attached grievance, indicating any action taken.
Date Due: A.S.A.P.

Against 20 Staffs At DSNF

13-0023/157704        Tyrgg Smith        IF 268325
Grievance Number          Inmate Name          Inmate Number

WE HAVE NO RECORD OF ANY GRIEVANCE FILED AT SPND BY INMATE SMITH (268325) AFTER SEPT 2012, WHEN HE WAS TRANSFERRED TO RMSI.

↑

I "PRIVILEGED MAILED" it DIRECTLY

Received
MAR 0 7 2013
RMSI Grievance Office

to Sgt. J. CAMPbell! 11·8·12 9:12 p.m.

Policy 507.02 (IV)
Prog 9 of 14 (N)
Policy 501·01 (VI)
Page 2 of 9 (C)(3)
("And All Documentation")

Capt W. J. Jeasl
SIGNATURE

2-25-13
DATE

White - Inmate Grievant    Canary – Warden    Pink – Grievance Committee    Goldenrod – Commissioner

CR-3148 (Rev. 3-00)



**STATE OF TENNESSEE**
**DEPARTMENT OF CORRECTION**
**RIVERBEND MAXIMUM SECURITY INSTITUTION**
**7475 COCKRILL BEND BLVD.**
**NASHVILLE, TENNESSEE 37243-0471**
**TELEPHONE (615) 350-3100 . FAX (615) 350-3400**

MEMORANDUM

TO:     Grievance Chairperson, DSNF

FROM:   Sgt. Gregory Leonard, RMSI Grievance Chairperson

DATE:   March 12, 2013

RE:     Grievance Process – Tyree Smith #268325


Enclosed is I/M Smith's grievance. I went ahead and had him appeal. However, your office by policy should have processed this grievance through level two without the inmate's appeal.

Once you have a hearing in absentia and obtain the Warden's response, then send grievance back to my office for appeal.


If I can be of any further assistance let me know.


Thank You,

*[signature]*

GL/ch

Cc:    DSNF
       File

**✳ UnEXHausTEd REmEdies ✳**
↓
"11·8·12"

TENNESSEE DEPARTMENT OF CORRECTION

### INMATE GRIEVANCE



MR. TyREE C. Smith   #268325   DSNF 7-F #110 CEll
NAME                 NUMBER    INSTITUTION & UNIT

DESCRIPTION OF PROBLEM: I MR. Smith wish to file this complaint against cpl. f Estes, c/o J. Champaco, c/o T. PErkins, c/o S. Morris, c/o B. OVERSTREET, c/o T. Rogers, cpl. J. Connell, cpl. M. Richard, cpl. M. fARRish, c/o E. Cardoso, c/o E. Johnson, c/o C. Talley, cpl. K. Templin, c/o B. WEGEnkE, c/o M. GREEnwood, c/o C. fuERST, →

REQUESTED SOLUTION: I MR. Smith wish to REquest (vigorously) for the 20 particular individuals listed at the VERy Beginning of this complaint to be REported immediately to the local District Attorney General office for Criminal Prosecution. Thank You!

_Mr. Tyrell Smith_                              3·8·13
Signature of Grievant                          Date

┄┄┄┄┄┄┄┄┄┄┄┄┄┄┄┄┄┄┄┄┄┄┄┄┄┄┄┄┄┄┄┄┄┄┄┄┄

*TO BE COMPLETED BY GRIEVANCE CLERK*

_____   _____   _____
Grievance Number    Date Received    Signature Of Grievance Clerk

INMATE GRIEVANCE COMMITTEE'S RESPONSE DUE DATE: _____

AUTHORIZED EXTENSION: _____
                      New Due Date                    Signature of Grievant

┄┄┄┄┄┄┄┄┄┄┄┄┄┄┄┄┄┄┄┄┄┄┄┄┄┄┄┄┄┄┄┄┄┄┄┄┄

### INMATE GRIEVANCE RESPONSE

Summary of Supervisor's Response/Evidence: _____

_____

_____

Chairperson's Response and Reason(s): _____

_____

_____

DATE: _____   CHAIRPERSON: _____

Do you wish to appeal this response? _____ YES _____ NO

If yes:   Sign, date, and return to chairman for processing within five (5) days of receipt of first-level response.

_____   _____   _____
GRIEVANT            DATE              WITNESS

Distribution upon final resolution:

   White – Inmate Grievant   Canary – Warden   Pink – Grievance Committee   Goldenrod – Commissioner (if applicable)

DESCRIPTION OF PROBLEM: → c/o R. Tidwell, c/o H. Alexander, c/o T. Griffin and c/co C. Jones. Those 20 Particular Staffs have committed and/or Participated with each other in some type of shape, form or fashion of cowardly, wrongful and/or illegal activities committed mostly against maximum security prisoners Diagnosed with a mental illness or symptoms of mental illness (11-8-12 4:00 p.m. 7-C, 7-f and 7-B DSNF).

(1) Cpl. J. Connell and c/o T. Rogers maliciously, Sadistically and severely beated max Prisoner Shaun Johnson in Handcuffs and leg Irons very, very Badly. Mr. Johnson Entire face was Practically swollen completely. Photos and Photos of Mr. Johnson's face was Photographed by Cpl. Manning (7-21-12 Between 2:00 p.m. and 5:00 p.m. 7-C #121 cell). According to Mr. Johnson, for 2 or 3 weeks straight, he was viciously Denied to go visit the Treatment Team, Receive a shower, and Receive his Hour Recreation as well when his incident occurred. Also, according to Mr. Johnson, he strongly Believe Sgt. D. Beasley maliciously instructed the Medical officials at DSNF not to Really Chart Down anything within his Medical Record of him Receiving Any Real Serious Physical injuries. Dr. O'Toole, Mr. Yakov Murphy, Mr. Derrick Sawyer and Mr. Harry Webb witnessed Mr. Johnson's face Seriously, Seriously injuried. Mr. Johnson's step-Brother ("Mr. Yakov Murphy") was Transferred to Another TDOC institution for (Basically) complaining About Mr. Johnson incident. Regardless Though! Connell and Rogers Done it strictly, strictly, strictly out of An Evil Motive to try to cause → as much Physical Harm to Mr. Johnson as much as they possibly could by All means (7-21-12 Between 7:00 a.m. and 9:30 a.m. 7-C #121 cell DSNF)!

(2) Resigned Cpl. f. Estes, c/o S. Morris and c/o B. Overstreet maliciously and Sadistically Attacked max Prisoner Michael Birdsong in Handcuffs. If I'm not mistaken, Mr. Birdsong Received No Physical injuries. Regardless Though! All 3 Staffs Done it strictly out of An Evil Motive to try to cause Physical Harm to Mr. Birdsong. Mr. Tyree Smith and Max Prisoner Ernest fitzgerald Are Eye witnesses to Mr. Birdson incident taking Place (12-29-10 5:45 p.m. 7-C #113 cell DSNF)!

(3) Resigned Cpl. f. Estes, c/o T. Perkins and c/o R. Tyler maliciously and Sadistically Attacked max Prisoner James Wood in Handcuffs. If I'm not mistaken, Mr. Wood Received No Physical injuries. Regardless Though! All 3 Staffs Done it strictly out of An Evil Motive to try to cause Physical Harm to Mr. Wood (3-7-11 Between 7:00 p.m. and 8:30 p.m. 7-C #128 cell DSNF)!

(4) c/o J. Champaco maliciously and Sadistically Attacked Max Prisoner Rashad Robinson in Handcuffs and leg Irons. Champaco Quickly Snatched the chain of the leg Irons causing Mr. Robin to fall flat on his face Really Hard as Mr. Robinson was still in Handcuffs as well. If I'm not mistaken, Mr. Robinson Received No Physical injuries. Regardless Though! Champaco Done it strictly, strictly out of An Evil Motive to try to cause Physical Harm to Mr. Robinson by All means. Also, According to Mr. Robinson, he was About to "Black out" as someone was kicking him Down on his cell Room floor. Resigned Cpl. f. Estes, c/o T. Perkins and c/o E. Candaso witnessed Mr. Robinson incident taking Place (4-25-12 Between 8:30 p.m. and 9:15 p.m. 7-f #103 cell DSNF)!

Distribution upon final resolution:

White – Inmate Grievant     Canary – Warden     Pink – Grievance Committee     Goldenrod – Commissioner (if applicable)

**TENNESSEE DEPARTMENT OF CORRECTION**

**INMATE GRIEVANCE**        **(continuation sheet)**

DESCRIPTION OF PROBLEM: (5.) Cpl. K. Templin maliciously and sadistically attacked max prisoner Kativa Bolds in handcuffs and in leg irons. Templin was causing Mr. Bolds extreme pain inside of Mr. Bolds's cellroom which kept causing Mr. Bolds to yell out real loud in a "hurting" type of manner. Mr. Tyree Smith witnessed Mr. Bolds yelling. However, if I'm not mistaken, Mr. Bolds received no physical injuries. Regardless though! Templin done it strictly out of an evil motive to try to cause physical harm to Mr. Bolds. 2 or 3 unknown staffs at this particular moment witnessed Mr. Bolds's incident taking place (7·16·11 between 2:45 p.m. and 3:30 p.m. 7-F #109 cell DSNF 2ⁿᵈ shift)!

(6.) C/O M. Spencer and C/O W. Reagan maliciously and sadistically attacked max prisoner Ronald Greene in handcuffs very, very badly. The right side of Mr. Greene's rib cage was fractured very, very badly. As Spencer was physically attacking Mr. Greene, he was using racial slurs towards Mr. Greene. The very next following morning Mr. Greene was escorted to the Health Center for an X-Ray. According to Mr. Greene, he believe the medical officials at the Health Center didn't really actually chart down within his medical record of him receiving no real physical injuries. Also, later on the exact same day when Mr. Greene got X-Rayed, Nurse Diane Roe approached Mr. Greene's cellroom door and strongly tried to encourage Mr. Greene to tell a huge, enormous, gigantic malicious bold face lie about his incident. Cpl. F. Estes was with her. Regardless though! Spencer and Reagan done it strictly, strictly out of an evil motive to try to cause real serious physical harm to Mr. Greene by all means (between 9·1·11 and 10·1·11 between 7:00 p.m. and 8:30 p.m. 7-C #121 cell DSNF 2ⁿᵈ shift)!

(7.) C/O E. Johnson and C/O C. Talley maliciously and sadistically attacked max prisoner DeJuan Griffin in handcuffs and I think in leg irons as well. If I'm not mistaken, Mr. Griffin received no physical injuries. Regardless though! Both staffs done it strictly out of an evil motive to try to cause physical harm to Mr. Griffin (between 1·5·12 and 1·23·12 between 3:00 p.m. and 8:00 p.m. 7-C 121 or 114 cell DSNF 2ⁿᵈ

(8.) C/O J. Champaco maliciously and sadistically attacked max prisoner Kativa Bolds in handcuffs and leg irons inside the elevator going downstairs from 7-F to 7-C. If I'm not mistaken, Champaco assaulted Mr. Bolds in the face and kicked Mr. Bolds in the back of the head when Mr. Bolds feeled down to the elevator floor. If I'm not mistaken, Mr. Bolds received no physical injuries. Regardless though! Champaco done it strictly out of an evil motive to try to cause physical harm to Mr. Bolds by all means. 2 or 3 unknown staffs (at this particular moment) witnessed Mr. Bolds's incident taking place (7·16·11 between 3:30 p.m. and 4:30 p.m. 2ⁿᵈ shift DSNF 7-F)!

(9.) C/O E. Johnson maliciously and sadistically attacked max prisoner Michael Ware in handcuffs and leg irons inside the elevator going downstairs from 7-F to 7-C. Mr. Ware refused to reveal to Mr. Tyree Smith what physical injuries he ("Mr. Ware") might've received. Regardless though! Johnson done it strictly out of an evil motive to try to cause physical harm to Mr. Ware. C/O T. Perkins and I think C/O E. Cardas witnessed Mr. Bold's →

Distribution upon final resolution:

White – Inmate Grievant    Canary – Warden    Pink – Grievance Committee    Goldenrod – Commissioner (if applicable)



**TENNESSEE DEPARTMENT OF CORRECTION**

**INMATE GRIEVANCE** **(continuation sheet)**

DESCRIPTION OF PROBLEM: →Incident taking place (5·9·12 Between 9:00 a.m. And 12:30 p.m. Unit Seven Elevator. DSNF)!

(10) C/o R. Tidwell and C/o H. Alexander maliciously and sadistically attacked max prisoner Tommy Hollars. Both staffs maliciously unsecured Mr. Hollar's Cellroom Door. They then Rushed into Mr. Hollar's Cellroom with Handcuffing Mr. Hollars first through the Pie-flap. Tidwell Punched Hollars in the Right eye. It was Swollen A little. Mr. Hollars also had a little Ring Around his Right eye like a "Black eye." Tidwell choked Mr. Hollars as well. Nurse Consandra Hughes Viciously Ripped Mr. Hollar's Clothes off of him Completely with Some Type of Real Sharp Blade object. Mr. Hollars was Completely Naked for about 9 Hours Straight and his Bed mattress was Confiscated. Nurse Hughes Claimed Mr. Hollars Spitted on her. Mr. Tyree Smith witnessed Mr. Hollars incident taking place. Even Behavioral Specialist Lewis and C/o A. Goins witnessed Mr. Hollar's Right eye Bruised. Regardless Though! All 3 of those Particular individuals Done it strictly, Strictly out of an Evil Motive To try to Cause Physical Harm to Mr. Hollars by All means (9·4·12 7:35 p.m. 7-F #112 Cell DSNF)!

(11) C/o T. Rogers went Toe to Toe with max prisoner Danny Brooks. If I'm not mistaken, Mr. Brooks Received No Physical injuries. Regardless though! Rogers Done it strictly out of an Evil motive to try to Cause Physical Harm to Mr. Brooks. Cpl. M. Farrish and C/o B. Wegenke witnessed the Physical Altercation taking Place (Between 4·1·12 And 6·30·12 between 7:30 a.m and 10:30 a.m. 7-C Rec. Cage DSNF)!

(12) C/o E. Johnson went Toe to Toe with max prisoner Equilius Bolton. If I'm not mistaken, Mr. Bolton Received No Physical injuries. Regardless Though! Johnson Done it strictly out of an Evil Motive to try to Cause Physical Harm to Mr. Bolton. →Cpl. M. Richards, C/o T. Rogers, C/o C. Fuerst And C/o T. Griffin witnessed the Physical Altercation taking Place (Between 5·25·12 And 6·4·12 between 9:00 a.m And 11:30 a.m. 7-C Rec. Cage DSNF)!

(13) Resigned Cpl. F. Estes went Toe to Toe with max prisoner Equilius Bolton. If I'm not mistaken, Mr. Bolton Received No Physical injuries. Regardless Though! Estes Done it strictly out of an Evil Motive to try to Cause Physical Harm to Mr. Bolton. Cpl. J. Connell, C/o T. Rogers And C/o C. Jones witnessed the Physical Altercation taking Place. Also, after the Physical Altercation had ended, and when Estes then Proceeded to Place Handcuffs back Around Mr. Bolton's wrist, he then "Sucker-Punched" Mr. Bolton in the face off gard (Between 6·20·12 And 7·4·12 between 9:00 a.m. And 11:30 a.m. 7-C #122 Cell DSNF)!

(14) Resigned Cpl. F. Estes and C/o S. Morris unlocked the Rec. Cage Door of max prisoner Demario Driver And max prisoner David Moore for those 2 Same Particular max prisoners to Engage into a Physical Altercation with Each other inside the Same Rec. Cage. If I'm not mistaken, Either of those 2 Particular max Prisoners Received No Physical injuries. Regardless Though! Both staffs Done it strictly out of an Evil →

Distribution upon final resolution:

White – Inmate Grievant    Canary – Warden    Pink – Grievance Committee    Goldenrod – Commissioner (if applicable)


DESCRIPTION OF PROBLEM: → Motive Just to SEE those 2 PARTICULAR MAX Prisoners try to Cause Physical Harm to Each other by All means (Between 6·1·11 and 7·31·11 between 2:30 p.m. And 4:00 p.m. 7-f REC. AREA DSNF)!

(15). Resigned Cpl. F. Estes And C/O T. Perkins Unlocked the REC. Cage Door of Max Prisoner Michael Walker and Max Prisoner Ernest Fitzgerald for those 2 same PARTICULAR max Prisoners to Engage into a Physical Altercation with Each other inside the Same REC. Cage. If I'm not mistaken, Either of those 2 PARTICU Max Prisoners RECEIVED No Physical injuries. Regardless Though! Both Staffs Done It strictly out of An Evil Motive Just to SEE those 2 PARTICULAR max PRISONers try to CAUSE Physical HARM to Each other by All means (Between 10·14·11 And 11·30·11 between 2:00 p.m. And 4:00 p.m. 7-f REC AREA DSN F)!

(16). C/O T. Perkins and Resigned C/O M. Spencer Unlocked the REC. Cage Door of Max Prisoner Michael Walker and Max Prisoner Robert Hobson for those 2 same Particular max Prisoners to Engage into a Physical Altercation with Each other inside the Same REC. Cage. If I'm not mistaken, Either of those 2 PARTICULAR max Prisoners RECEIVED No Physical injuries. Regardless Though! Both Staffs Done it strictly out of An Evil Motive Just to SEE those 2 PARTICULAR max Prisoners try to Cause Physical HARM to Each other by All means (Between 12·1·11 and 12·31·11 between 2:30 p.m. And 4:00 p.m. 7-f REC. AREA DSN F)!

(17). C/O T. Perkins And C/O J. Champaco Unlocked the REC. Cage Door of Max Prisoner Marcus Wright and Max Prisoner Charles Nelson for those 2 same Particular max Prisoners to Engage into A Physical Altercation with Each other inside the Same REC. Cage. MR. Nelson RECEIVED A Blood Clot in his Right Eye. MR. Wright literally tried to take MR. Nelson's Eye out with his fingers. If I'm not mistak MR. Wright RECEIVED No Physical injuries. Regardless Though! Both Staffs Done It strictly out of An Evil Motive Just to SEE those 2 Particular Max Prisoners try to Cause Physical HARM to Each other by All means (3·28·12 Bout 3:10 p.m. 7-F REC. AREA DSNF)!

(18). C/O T. Perkins And C/O J. Champaco Unlocked the REC. Cage Door of Max Prisoner MR. Tyree Smith and Max Prisoner Courtney Stroggins for those 2 same Particular max Prisoners to Engage into a Physical Altercation with Each other inside the Same REC. Cage. MR. Smith RECEIVED a Knot on the left side of his forehead. The Right side of his Nostril Started Bleeding. And he Seriously injuried his Pinky finger of his Right Hand. MR. Stroggins injuried one of his fingers of his Right Hand as well. Regardless Though! Both Staffs Done It Strictly out of An Evil Motive Just to SEE those 2 Particular max Prisoners try to Cause Physical HARM to Each other by All means (3·28·12 Bout 3:20 p.m. 7-f REC. AREA DSN

(19). C/O T. Perkins And C/O J. Champaco Escorted Max Prisoner Bruce Matthews from his Cellroom to the REC. AREA for him to Engage into a Physical Altercation with Max Prisoner Ernest Fitzgerald inside the Same REC. Cage with Each other. MR. Matthews was Hit in the Testicles maybe 2 or 3 →

Distribution upon final resolution:

White – Inmate Grievant    Canary – Warden    Pink – Grievance Committee    Goldenrod – Commissioner (if applicable)

**TENNESSEE DEPARTMENT OF CORRECTION**

**INMATE GRIEVANCE**     (continuation sheet)

DESCRIPTION OF PROBLEM: → times by Mr. Fitzgerald. If I'm not mistaken, Mr. Fitzgerald Received No Physical injuries. Regardless Though! Both Staffs Done it strictly out of an Evil Motive Just to See those 2 Particular Max Prisoners try to Cause Physical Harm to Each other by All means. Right Before (or After) the Physical Altercation Proceeded, Max Prisoner James Wood was inside the Same Rec Cage with Mr. Fitzgerald Braiding Mr. Fitzgerald's Dreadlocks (4.8.12 Bout 2:45 p.m. 7-F Rec. Area DSNF

Now, Regarding to this Entire Complaint, Majority, of the Max Prisoners listed within this Complaint Are Diagnosed with Mental illness or Symptoms of Mental illness. To me, All of them have a Real Serious Mental Problem. Some of them Are on Psych medication. Its like they have Good Sense and they Don't Have Good Sense. To me, Seriously, they Are not Quite right in the Head At All. And those Very main Particular max Prisoners of which I'm Speaking of right now Are the following . . . . . . . . . Mr. Tommy Hollars, Mr. Ronald Greene, Mr. Kativa Bolds, Mr. Rashad Robinson, Mr. Equilius Bolton, Mr. Michael Birdsong, Mr. Michael Ware and Mr. Shaun Johnson. C/o C. Mitchell, C/o F. Massey, Cpl. D. Davis, Cpl. S. Shavers, Cpl. A. Reinitz, Cpl. A. Kelly, C/o A. Ellison, C/o O. Torres, C/o M. Hicks, C/o J. Robbins and RESigned C/o C. Montgomery, need to be Placed under a "Rummage" investigation immediately! Now, Regarding to the incidents listed within this Entire Complaint, they Are likely to be Very Similar to How many other Max Prisoners Are Being "Ill-Treated" As well At other institutions of the T.D.O.C. And those Very main Particular institutions of the T.D.O.C. of which I'm Speaking of right now Are the following . . . . . . . . . MCCX, WTSP, TCIP, BMCX and NECX! And RMSI As well Regarding to the wrongful Death of Max Prisoner Jason Toll in unit 3. I Mr. Smith have filed this following Complai And Hereby, Verify that the incidents Alleged therein Are True, Except As to incidents Alleged on information And Belief, And, As to those, I Believe them to be True. I Certify under Penalty of Perjury that the foregoing is True. So Therefore, I Mr. Tyree C. Smith Definitely, Absolutely Vigorously, Importantly, Aggressively and Mandatorily wish to file this Complaint Against the 20 Particular Staffs listed within this Particular Complaint by Each And Every means necessary! Thank You!

— End of Complaint —

| | | | | |
|---|---|---|---|---|
| Policy 501.01 (VI.) | Policy 501.01 (IV.) | Policy 501.01 (IV.) | T.C.A. Volume 7-A | T.C.A. Volume 7-A |
| Page 6 of 9 (N.)(I.) | Page 2 of 9 (K.) | Page 1 of 9 (G.)(H.) | 41.21.408 | 41.1.113 |

| | | | |
|---|---|---|---|
| T.C.A. Volume 7-A | Policy 305.03 (VI.) | T.C.A. Volume 7-A | West's T.C.A. Title 33 |
| 41.1.114 | Page 1 of 3 (A.)(B.) | 41.1.103 (A.) | 33.9.201 Article Two (4.) |

| | | | |
|---|---|---|---|
| West's T.C.A. Title 4 | Policy 502.01 (IV.) | West's T.C.A. Title 33 | Policy 506.16 (IV.) |
| 4.21.301 (2.) | Page 2 of 37 (I.) | 33.2.416 (A.)(B.)(3.) | Page 1 of 11 (A.) |

Distribution upon final resolution:

White – Inmate Grievant     Canary – Warden     Pink – Grievance Committee     Goldenrod – Commissioner (if applicable)



**TENNESSEE DEPARTMENT OF CORRECTION**

<u>**INMATE GRIEVANCE**</u>     **(continuation sheet)**

DESCRIPTION OF PROBLEM: → Policy 305.03 (VI.)   Policy 103.01 (VI.)
Page 3 of 3 (L)   Page 3 of 6 (E)

* CRUEL and UNUSUAL PUNISHMENT *
* FAILURE to PROTECT *
* FEDERAL CONSTITUTIONAL Rights VIOLATION *
* DISCRIMINATION *

So Duly Noted °.

Practically, this is My 4th time filing this VERY SAME PARTICULAR Complaint EVER SINCE I been located At RMSI. The FIRST time, is when I PERSONALLY "PRIVILEGED MAILED" it DIRECTLY through the U.S. Mail to Sgt. Julia Campbell At DSNF ( 11·8·12 9:10 p.m. 4-D #105 CELL B-shift RMSI ). And then, the second time, is when I FORWARDED this PARTICULAR Complaint DIRECTLY through the "HOUSE-MAIL" to Sgt. G. Leonard for him to forward it DIRECTLY to Sgt. Julia Campbell for PROCESSING At DSNF ( 1·8·13 9:00 p.m. 4-D #202 CELL B-shift RMSI Complaint #13-0023/#257704 ). And then, the 3rd time, is when I "PRIVILEGED MAILED" it DIRECTLY through the U.S. Mail to My SISTER for her to sign her name somewhere on my Complaint, DEVELOP COPIES OF it, and then Mail it DIRECTLY to WARDEN JEWEL STEELE AT DSNF for STEELE to then forward it DIRECTLY to Sgt. Julia Campbell for PROCESSING through the GRIEVANCE PROCEDURE which I'm still not VERY QUITE SURE At this EXACT PARTICULAR Moment if My SISTER ACTUALLY OBEYED All of my INSTRUCTIONS to her ( 1·13·13 8:00 p.m. 4-D #202 CELL B-shift RMSI ). But still, However, I RECEIVED ABSOLUTELY No GRIEVANCE NOTIFICATION SHEET not ONCE regarding to any of those 3 PREVIOUS PARTICULAR PRISON Complaints of mines by No means and UNDER No circumstances. And I PERSONALLY KNOW for A COLD-BLOODED FACT (one way or the other) Sgt. Julia Campbell At least RECEIVED the FIRST PARTICULAR PRISON Complaint of mines "PRIVILEGED MAILED" DIRECTLY to her through the U.S. Mail. However, Those ARE the STEPS I took. I EVEN FORWARDED SEVERAL WRITTEN BRIEF LETTERS through the "HOUSE-MAIL" to Sgt. G. Leonard And WARDEN Roland Colson for them to forward them DIRECTLY to Sgt. Julia Campbell and WARDEN JEWEL STEELE At DSNF regarding to my FIRST PARTICULAR PRISON Complaint. And still, I RECEIVED Not ONE GRIEVANCE NOTIFICATION SHEET regarding to that EXACT SAME PARTICULAR Complaint. So, I EVENTUALLY, ADDRESSED this ENTIRE PARTICULAR Situation through the Mail to MR. KEITH THROCKMORTON, the NASHVILLE BAR ASSOCIATION, the AMERICAN CIVIL LIBERTIES UNION, And to the COCHRAN, UHLMANN, ABNEY, DUCK and WRIGHT LAW FIRM AS WELL. So now, like I said, this is PRACTICALLY my 4th time filing this PARTICULAR Complaint. SO THEREFORE, Copies of this EXACT PARTICULAR PRISON Complaint ARE DEVELOPED. I HAVE SUBMITTED A FULL ENTIRE COPY of this Complaint to MR. KEITH THROCKMORTON AS PROOF. I HAVE SUBMITTED ("PRIVILEGED MAILED") this ORIGINAL Complaint through the U.S. mail DIRECTLY to the NEW GRIEVANCE CHAIRPERSON At DSNF for PROCESSING the GRIEVANCE PROCEDURE At the EXACT SAME TIME I HAVE SUBMITTED a full ENTIRE Copy of this Complaint to MR KEITH THRO Page 8, 9, 10, 11 and Page 6 of 9 of The TDOC Policy 501.01 of the TDOC GRIEVANCE PROCEDURE Also ARE Attached to My Copy Submitted to the NEW GRIEVANCE CHAIRPERSON At DSNF. It is EXACTLY now 3·17·13. Thank You!

Distribution upon final resolution:

White – Inmate Grievant   Canary – Warden   Pink – Grievance Committee   Goldenrod – Commissioner (if applicable)



**TENNESSEE DEPARTMENT OF CORRECTION**

**INMATE GRIEVANCE** (continuation sheet)

(8)

DESCRIPTION OF PROBLEM:

1. MR. Shaun Johnson #294835
2. MR. Michael Birdsong #456896
3. MR. James Wood #425812
4. MR. Rashad Robinson #429350
5. MR. Kativa Bolds #225471
6. MR. Ronald Greene #110142
7. MR. DeJuan Griffin #399113
8. MR. Michael Ware #212627
9. MR. Tommy Hollars #413338
10. MR. Danny Brooks #373569
11. MR. Equilus Bolton #449343
12. MR. DeMario Driver #419678
13. MR. David Moore #433008
14. MR. Michael Walker #427022
15. MR. Robert Hobson #402758
16. MR. Marcus Wright #460159
17. MR. Charles Nelson #370992
18. MR. Tyree Smith #268325
19. MR. Courtney Scroggins #390295
20. MR. Bruce Matthews #458505
21. MR. Ernest Fitzgerald #446498
22. Witness Dr. O'Toole
23. Witness Yakou Murphy #325420
24. Witness Derrick Sawyer #268309
25. Witness Harry Webb #306797
26. Cb S. Braden and Sgt. R. Lane vs. MR. Luis Ramon #318510 at WTSP.
27. Lt. B. Mullins vs. MR. David Faulkner #447456 at WTSP.
28. Cert Team vs. MR. Kyle Kirshner and MR. Christopher Greene #437648 at MCCX. #458589
29. ~~Cb Cb Cb~~ Cert Team vs. MR. Steven Jelks #366188 at MCCX.

Distribution upon final resolution:

White-Inmate Grievance Canary-Warden Pink-Grievance Committee Goldenrod-Commissioner (if applicable)

9528



STATE OF TENNESSEE
**DEPARTMENT OF CORRECTION**
6TH FLOOR RACHEL JACKSON BLDG.
320 SIXTH AVENUE NORTH
NASHVILLE, TENNESSEE 37243-0465



U-4 D101

## MEMORANDUM

Inmate Name: _Tyree Smith_      TDOC Number: _267325_

Institution: _RMSI_      Housing Unit: _4B105_

Institution Grievance Number: _B-2051_    TOMIS Grievance Number: _258748_

Commissioner's Response and Reasons:

The Director of Health Services has reviewed the grievance and:

☐ Concurs with Warden    ☐ Concurs with Committee      ☑ Concurs with Supervisor

☐ Concurs Medical Co-Payment was Appropriate

☐ Appeal Denied


_3-8-13_
Date

_Jane Woodwell /en_
Deputy Commissioner of Operations

DS-6

RECEIVED
4·3·13

4528



TENNESSEE DEPARTMENT OF CORRECTION
**INMATE GRIEVANCE RESPONSE**

CLINICAL SERVICES
FEB 2 8 2013
RECEIVED

| Tyree Smith | 268325 | RMSI 4-D-202 | 13-0051/258018 |
|---|---|---|---|
| NAME | NUMBER | INSTITUTION & UNIT | GRIEVANCE NUMBER |

Summary and Testimony Presented to Committee

Inmate Grievance Committee's Response and Reasons _Due to inmate behavior and incident in Unit - Grievance is being set to next level within 5 to Boyd._

| 2/12/13 | | |
|---|---|---|
| Date | CHAIRMAN | MEMBER |

| | C/o Boyd | |
|---|---|---|
| MEMBER | MEMBER | MEMBER |

Warden Response:     Agrees with Proposed Response          ☑

Disagrees with Proposed Response          ☐

If Disagrees, Reasons for Disagreement

Action Taken:

Received

DATE: 2-13-13    FEB 1 4 2013 WARDEN'S SIGNATURE:

RMSI Grievance Office

Do you wish to appeal this response? _____ YES          _____ NO

If yes:     Sign, date, and return to chairman for processing. Grievant may attach supplemental clarification of issues or rebuttal/reaction to previous responses if so desired. ved

| Tyree Smith RECEIVED | 2.15.13    FEB 2 0 2013 | |
|---|---|---|
| GRIEVANT | DATE RMSI Grievance Office | WITNESS |

Commissioner's Response and Reason(s):
FEB 2 2 2013

TDOC Operations

| | |
|---|---|
| DATE | SIGNATURE |

White-Inmate   Canary-Warden   Pink- Grievance Committee   Goldenrod-Commissioner

CR -1393 (Rev. 3-00)                                                          RDA 2244




# TENNESSEE DEPARTMENT OF CORRECTION

## INMATE GRIEVANCE

NAME: MR. TyREE Smith    NUMBER: #268395    INSTITUTION & UNIT: R.M.S.I. 4-D #202Cε11

DESCRIPTION OF PROBLEM: I MR. Smith wish to file this Complaint AgAinst Nurse Practitioner Lisa Jack.
MR. Smith was Escorted from the Visitation Gallery ('B.B.') to the Triage Room to be Evaluated
Nurse Jack (1-17-13 9:15 a.m. 4-E Pod). She Refuses to Believe my Pinky finger is injuried. She Refuses →

REQUESTED SOLUTION: I MR. Smith wish to Request for Nurse. Practitioner Lisa Jack to Appoint me to
an Occupational Therapist immediately. Thank You.

Signature of Grievant: mr Tyree Smith    Date: 1-17-13

:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

### TO BE COMPLETED BY GRIEVANCE CLERK

Grievance Number: 13-0051/00258418    Date Received: 2/5/13    Signature Of Grievance Clerk: 2-26-13

INMATE GRIEVANCE COMMITTEE'S RESPONSE DUE DATE: 2-26-13

AUTHORIZED EXTENSION: _____ New Due Date: _____ Signature of Grievant: _____

### INMATE GRIEVANCE RESPONSE

Summary of Supervisor's Response/Evidence: See CR-3198

Chairperson's Response and Reason(s): Sup. Response Recvd

DATE: 2-7-13    CHAIRPERSON: S Leonard

Do you wish to appeal this response? ABsolutely!!! YES _____ NO

If yes: Sign, date, and return to chairman for processing within five (5) days of receipt of first-level response.

GRIEVANT: mr Tyree Smith    DATE: 2-7-13    WITNESS: _____

Distribution upon final resolution:

White – Inmate Grievant    Canary – Warden    Pink – Grievance Committee    Goldenrod – Commissioner (if applicable)

CR-1394 (Rev. 3-00)



# TENNESSEE DEPARTMENT OF CORRECTION

## INMATE GRIEVANCE          (continuation sheet)

2)

DESCRIPTION OF PROBLEM: →to Appoint ME to An OCCUPATIONAL THERAPIST by No MEANS. I Signed-up on Sick-Call SEVERAL times. I injuried my Pinky finger of my Right HAnd. It HAVEN't been feeling Normal Eversince then (3-08-12 3:20 p.m. D.S.N.F. 9-f REC. AREA). This is a URGENT MEDICAL NEED. My Pinky fingER NEED to be TREATED. HowevER, OBviously, NursE JACK DoEsn't CARE. I will continue to sign-up on Sick-Call. So THEREfoRE, I DEfinitely, ABSolutely, VigoRously, Diligently, And MAndataRily WisH to file this Complaint AgAinst NursE PRActitionER LisA JACK by EACH And EveRy MEAns NECESSARY! I will TRy to Notify My ConsErvatOR. Thank You!

— End of Complaint —

Policy 501.01 (IV.)    WEST's T.C.A. Title 41    WEST's T.C.A. Title 33
PAge 1 of 9 (E.)      41-1408               33-6-1007

★ DEliBERAtE INDiffeReNCE ★

Duly NotED:

This PARticulAR Complaint would have been filed weeks Ago but I'm HAving DifficultiEs with my ComplAint Against J. RHODES being PRoCESSED. Thank You!

Distribution upon final resolution:

White – Inmate Grievant   Canary – Warden   Pink – Grievance Committee   Goldenrod – Commissioner (if applicable)



# TENNESSEE DEPARTMENT OF CORRECTION

## RESPONSE OF SUPERVISOR OF GRIEVED EMPLOYEE OR DEPARTMENT

DATE: 2/5/2013         Please respond to the attached grievance, indicating any action taken
                       Date Due:         2/8/2013

| 13-0051/00258418 | Tyree Smith | 268325 |
|---|---|---|
| Grievance Number | Inmate Name | Inmate Number |

Presently, there is no additional treament required by the Medical Provider or need for a consultation.
Hand exercises will assist in the movement of the finger in question.

_____          2-6-2013
SIGNATURE                                      DATE

White-Inmate Grievant Canary-Warden Pink-Grievance Committee Goldenrod-Commissioner



| ADMINISTRATIVE POLICIES AND PROCEDURES State of Tennessee Department of Correction | Index #: 506.16 | Page 1 of 11 |
| | Effective Date: February 15, 2010 | |
| | Distribution: B | |
| | Supersedes: 506.16 (2/15/07) | |

Approved by: George M. Little



Subject: LIVING CONDITIONS FOR SEGREGATED INMATES

---

I.   **AUTHORITY:** TCA 4-3-603, TCA 4-3-606.

II.  **PURPOSE:** To provide guidelines governing the living conditions of inmates segregated from the general population.

III. **APPLICATION:** Assistant Commissioner of Operations, institutional employees, privately managed facilities, and inmates, excluding any offender assigned to and actively participating in a Special Alternative Incarceration Unit (SAIU) program or the Parole/Probation Violators program.

IV.  **DEFINITIONS:**

    A.    **Administrative Segregation:** The purposeful separation of inmates believed to be a threat to the security of the institution, the welfare of staff, or to other inmates.

    B.    **Commissioner's Designee (CD):** TDOC employee(s) authorized by the Commissioner to serve as the approving authority for specific actions occurring at privately managed facilities. In the absence of the CD, the contract monitor (CM) assigned to that facility will serve that function. In the absence of both the CD and CM at privately managed facilities, the necessary notification/request for authorization will be made by telephone to the CD. If the CD is not reachable via phone, the CM will be contacted. If both the CD and CM are unavailable by telephone, the ranking shift officer at Turney Center Industrial Complex (TCIX) shall be contacted for required authorizations or notifications.

    C.    **Mandatory Segregation:** Assignment to maximum security housing of those inmates committed to the department under the sentence of death or unsentenced individuals placed in the physical custody of the department by court order for safekeeping.

    D.    **Protective Custody:** Separation of inmates from the general population for the purpose of providing a level of safety for inmates requiring such.

    E.    **Punitive Segregation:** The confining of an inmate as a result of a disciplinary conviction, for no longer than 30 days, as punishment for the commission of an infraction.

    F.    **Safekeeping:** The status of inmates who are confined under mandatory segregation to a TDOC institution and who have not been adjudicated and/or formally sentenced.

    G.    **Segregation:** The purposeful separation of inmates from the general inmate population in confinement or housing where measures are taken to provide maximum security and/or to control their circumstances or circumscribe their freedom. This general status is for either punitive or administrative reasons.

    H.    **Transients:** Inmates who are temporarily (not exceeding 14 days) in the in-house count of a receiving institution and in the assigned count of a sending institution.



West's Tennessee Code Annotated Currentness
  Title 41. **Correctional** Institutions and Inmates
    Chapter 1. Penitentiary
      Part 1. General Provisions
        ➡§ 41-1-103. Officers and employees; oaths and affirmations

(a) All officers and other persons so employed to control and manage the penitentiary for the state shall, before entering upon the discharge of their duties, take and subscribe the following **oath**:

"I do solemnly swear (or affirm) that I will fully, faithfully, impartially, and diligently perform all the duties required of me as ____ in the penitentiary; that I will execute the laws and regulations prescribed for the government of the institution, so far as concerns my **office**; that I will accept no bribe, or other compensation during my continuance in **office**, other than such compensation as is allowed by law; and that I will, on no occasion, ill treat or abuse any convict under my care, beyond the punishment ordered by law, or the rules and regulations of the institution."

(b) The **oaths** of the assistant or deputy commissioners, wardens and superintendents shall be filed with the secretary of state. The **oaths** of all other employees shall be filed with the commissioner of **correction**.

(c) The violation of this **oath** by any of the officers or employees shall be perjury, punishable as in other cases of perjury.

CREDIT(S)

1871 Acts, c. 94, § 8; impl. am. by 1883 Acts, c. 171, § 20; 1895 Acts (Ex. Sess.), c. 7, § 9; 1984 Pub.Acts, c. 659, § 1.

**Formerly** 1858 Code, § 5453; Shannon's Code, § 7461; mod. 1932 Code, § 12064; § 41-103.

CROSS REFERENCES

    Perjury, see § 39-16-701 et seq.

LIBRARY REFERENCES

    Prisons ⚖6.
    Westlaw Topic No. 310.
    C.J.S. Prisons and Rights of Prisoners § 14.

T. C. A. § 41-1-103, TN ST § 41-1-103

Current with laws from the 2012 Second Reg. Sess., eff. through May 14, 2012

(c) 2012 Thomson Reuters.

END OF DOCUMENT

(c) 2012 Thomson Reuters. No Claim to Orig. US Gov. Works

... ''  ...  ...t.law.com/result/documenttext.aspx?origin=Search&cfid=1&tofrom=...    7/27/2012

T. C. A. § 33-9-201

West's Tennessee Code Annotated Currentness
Title 33. Mental Health and Intellectual and Developmental Disabilities
 Chapter 9. Interstate Provisions (Refs & Annos)
 Part 2. Interstate Compact on Mental Health (Refs & Annos)
 § 33-9-201. General provisions

The Interstate Compact on Mental Health is enacted into law and entered into by this state with all other states legally joining the compact in the form substantially as follows:

Interstate Compact on Mental Health

The contracting states solemnly agree that:

## ARTICLE II

As used in this compact:

(1) "Aftercare" means care, treatment and services provided a patient, as defined herein, on convalescent status or conditional release;

(2) "Institution" means any hospital or other facility maintained by a party state or political subdivision thereof for the care and treatment of mental illness or mental deficiency;

(3) "Mental deficiency" means mental deficiency as defined by appropriate clinical authorities to such extent that a person so afflicted is incapable of managing such persons and such persons affairs, but does not include mental illness as defined herein;

**(4) "Mental illness" means mental disease to such extent that a person so afflicted requires care and treatment for that person's own welfare, or the welfare of others, or of the community;**

## ARTICLE VI

The duly accredited officers of any state party to this compact, upon the establishment of their authority and the identity of the patient, shall be permitted to transport any patient being moved pursuant to this compact through any and all states party to this compact, without interference.



▷
West's Tennessee Code Annotated Currentness
  Title 4. State Government
    Chapter 21. Human Rights (Refs & Annos)
      Part 3. Violations--Procedures (Refs & Annos)
        → → § 4-21-301. Discriminatory practices

It is a discriminatory practice for a person or for two (2) or more persons to:

(1) Retaliate or discriminate in any manner against a person because such person has opposed a practice declared discriminatory by this chapter or because such person has made a charge, filed a complaint, testified, assisted or participated in any manner in any investigation, proceeding or hearing under this chapter;

(2) Aid, abet, incite, compel or command a person to engage in any of the acts or practices declared discriminatory by this chapter;

(3) Willfully interfere with the performance of a duty or the exercise of a power by the commission or one (1) of its members or representatives;

(4) Willfully obstruct or prevent a person from complying with this chapter or an order issued thereunder; or

(5) Violate the terms of a conciliation agreement made pursuant to this chapter.

CREDIT(S)

1978 Pub.Acts, c. 748, § 16.

**Formerly § 4-2114; § 4-21-114.**

LAW REVIEW AND JOURNAL COMMENTARIES

Comment: Employees Assumption of Risk: Real or Illusory Choice? Jane P. North, 52 Tenn. L. Rev. 35 (1984).

How to Keep Supervisors from Being Held Individually Liable. Colette Koby, Tara Ferguson, 42 Tenn. B.J. 20 (July 2006).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



| ADMINISTRATIVE POLICIES AND PROCEDURES State of Tennessee Department of Correction | Index #: 501.01 | Page 1 of 9 |
|---|---|---|
| | Effective Date: October 1, 2012 | |
| | Distribution: B | |
| | Supersedes: 501.01 (9/15/10) | |
| Approved by: Derrick D. Schofield | | |
| Subject: INMATE GRIEVANCE PROCEDURES | | |

I.  **AUTHORITY:** TCA 4-3-603, TCA 4-3-606, and TCA 41-24-110 and Title 28 CFR 115.

II.  **PURPOSE:** To establish a standard procedure for the expression and resolution of inmate complaints.

III.  **APPLICATION:** To Tennessee Rehabilitation Initiative in Correction (TRICOR) employees, employees and inmates of the Tennessee Department of Correction (TDOC), and privately managed facilities, except those offenders assigned to and actively participating in a Special Alternative Incarceration Unit (SAIU) program.

IV.  **DEFINITIONS:**

   A.  **Advocate:** An inmate who is selected by a grievant from his/her peers or from those appointed by the Warden to assist in the filing and/or appeal of a grievance.

   B.  **Calendar Days:** A time limit that begins to run at 12:01 a.m. on the day following the date of the triggering event. Example: if an inmate files a grievance and the alleged triggering event occurred on April 1st, the seven calendar day's time limit for filing grievances set by Section VI.(C)(1) below would begin to run at 12:01 a.m. April 2nd, and end at 11:59 p.m. on April 8th.

   C.  **Central Office Review:** Review of Title VI allegations by the Central Office Title VI Coordinator.

   D.  **Central Office Title VI Coordinator:** The TDOC employee appointed to adjudicate Title VI allegations and monitor compliance for the Department.

   E.  **Commissioner's Designee:** TDOC employee(s) authorized by the Commissioner to serve as the approving authority for specific actions occurring at privately managed facilities. In the absence of the CD, the contract monitor (CM) assigned to that facility will serve that function. In the absence of both the CD and CM at privately managed facilities, the necessary notification/request for authorization will be made by telephone to the CD. If the CD is not reachable via phone, the CM will be contacted. If both the CD and CM are unavailable by telephone, the ranking shift officer at Turney Center Industrial Complex (TCIX) shall be contacted for required authorizations or notifications.



   F.  **Emergency Grievance:** The resolution of a grievance that if subjected to the normal time limits could cause the grievant substantial risk of personal injury or irreparable harm.

   G.  **Grievance:** A written complaint concerning the substance or application of a written or unwritten policy or practice, any single behavior or action toward an inmate by staff or other inmates, or any condition or incident within the Department or institution which personally affects the inmate complainant.

   H.  **Grievance Chairperson:** The individual assigned by the Warden to supervise the inmate grievance process within the TDOC and privately managed facilities.

I. Grievance Committee: A committee composed of a staff chairperson appointed by the Warden and members consisting of elected staff and inmates. This committee provides a forum in which an inmate may resolve a grievance at Level II of the inmate grievance process.

J. Prison Rape Elimination Act (PREA): A federal law establishing a standard of zero tolerance for incidents related to sexual assault and rape on inmates and/or offenders.

K. Reprisal: Any action or threat of action against anyone for the good faith use of or good faith participation in the grievance procedure.

L. Title VI Site Coordinator: The Associate Warden at TDOC facilities and the Assistant Warden at privately managed facilities.

V. POLICY: The TDOC shall ensure that every inmate has the right to utilize the grievance procedure without fear of reprisal. All grievances shall be considered in a fair and impartial manner and resolved at the lowest possible level in the grievance procedure.

VI. PROCEDURES:

A. A handbook entitled *TDOC Inmate Grievance Procedures* shall provide detailed instructions for the filing and processing of inmate grievances and appeals, and for the election, appointment, and removal of grievance committee members. Copies of the handbook and any current departmental and institutional policies concerning inmate grievances will be available to inmates in the institutional legal library. Access to copies of the handbook shall be provided to all grievance committee members and alternates. All living units for housing segregated inmates shall also be provided with a copy of the handbook and policies regarding inmate grievances.

B. Access to the grievance procedure: Inmate Grievance, CR-1394, and locked grievance depositories shall be made available for use by all inmates. Inmates shall have unimpeded access to these grievance forms. If required to ask staff for the form (i.e., an inmate in segregation), an inmate shall be given the form without question or discussion. All inmates will be informed of grievance procedures during orientation.

C. Grievance Review Process: Except as otherwise provided in VI.(L) and (M), inmate grievances shall follow the following process

1. First Level: Grievances must be filed utilizing CR-1394 within seven calendar days of the occurrence or the most recent occurrences giving rise to the grievance. The chairperson shall review all grievances received and logged them as received and enter them on Grievance screen (LIBG).

   All copies of the form must be legible and intact. Grievance forms which are improperly completed or contain insufficient information for processing shall be returned to the inmate with instructions as to proper completion. It should not be logged as received (which starts the deadline times running) until the corrected version is submitted.

   If more than one inmate files a grievance on the same incident, the hearing and responses may be consolidated. This shall be noted on the grievance response forms and on Grievance (LIBG) on the Description Detail Screen.

B.   It is the duty of each employee to correct all incarcerated offenders observed in violation of departmental rules and regulations in a fair, consistent, and impartial manner.

C.   Conversation with inmates shall be limited to that necessary as part of the employee's duties. Inmate questions which cannot be answered shall be referred to the immediate supervisor. Inmates shall be addressed by name, rather than TDOC numbers.

D.   Social relationships are prohibited, including but not limited to emotional, sexual, or romantic attachments with offenders in an institution, offenders on parole or probation, and former inmates who have been discharged from TDOC custody or probation/parole supervision for less than one year.

E.   Sexual contact between employees and inmates is prohibited and subject to administrative and criminal disciplinary sanctions.  (See Policy #502.06)  Any staff member convicted of an offense that constitutes a sexual offense or violent sexual offense as defined in TCA 40-39-202 will be placed on Tennessee's sex offender registry.

F.   Social relationships are also prohibited with relatives, family, and/or clearly identifiable close associates of such persons unless written approval is obtained from the Commissioner for Central Office employees, Wardens for institutional employees, Superintendent for the Tennessee Correction Academy employees, or the Executive Director of TRICOR immediately upon establishment of such relationships.  When an employee is related in any way to an offender and/or an offender's relatives, the employee will report this fact to the Warden or Central Office Director upon employment or when the relationship becomes known to the employee.  Upon receipt of this information, the local manager and appropriate assistant commissioner will review and determine appropriate action to be taken.

G.   Allegations of employee sexual misconduct, sexual harassment, sexual contact and/or sexual abuse shall be investigated in accordance with TDOC policies and Tennessee statutes.  If the accusations are found meritorious, then the employee(s) shall be subject to disciplinary actions, up to and including termination, or appropriate actions where necessary, in accordance with Tennessee statute and TDOC policies. Consent on the part of an offender is not a defense on the part of the employee as a response to charges of any form of sexual misconduct.  (See Policy #502.06)

H.   An employee shall not trade, barter, or enter into any business transaction or maintain any business interaction with offenders or their families except as outlined in Policy #510.02, nor shall an employee carry, mail, pass, or throw contraband in or out of any correctional institution.  An employee shall not donate items to offenders or their families without prior approval of the Warden.

Should an employee have knowledge of any employee engaged in such trafficking, it is the employee's duty to report such information to his/her supervisor.  Failure to do so shall result in disciplinary action.  Any attempt by an employee to communicate or do business with offenders or their families through their relatives and/or clearly identifiable close associates in an effort to circumvent this policy shall be a violation of this policy.

CR-1090

I.    Exchange of correspondence or telephone conversations for any purpose other than related to official duty shall be considered a violation of this policy and shall result in disciplinary action being taken.

J.    The Warden/designee shall post incompatible notices on TOMIS conversation LIBA listing employee(s) and/or offender(s) that have been determined to be incompatible based on an investigation conducted by the Warden/designee including, but not limited to, the following reasons:

    1.    Assault by an offender with resulting serious physical injuries to the staff

    2.    Sexual assault upon the staff member

    3.    Employee's immediate family is a victim of the offender's crime which results in serious physical injury or death

    4.    Staff gave testimony which caused the offender to be sent to the TDOC or whose testimony caused the offender to receive an additional sentence while incarcerated, i.e., death sentence, etc.

    5.    A member of staff's immediate family gave testimony which may have resulted in the offender being incarcerated in TDOC

    6.    OPTIONAL: If any staff member has a close relative, immediate family member, or close personal friend incarcerated within the same institution

    7.    Other reasons if approved by the Assistant Commissioner of Operations.

K.    Signs that declare the Department's zero tolerance policy regarding employee/offender relationships shall be prominently posted at institutional checkpoints and sallyports, any additional areas deemed appropriate by the Warden, and also in Central Office.

L.    An employee who witnesses or knows of a violation of this policy must promptly report the violation. Any employee who fails to promptly report a violation shall be subject to disciplinary action, up to and including termination. An employee who retaliates against any person for reporting or providing information concerning a violation of this policy shall be subject to disciplinary action, up to and including, termination.

VII.    <u>ACA STANDARDS</u>: 4-4281-6.

VIII.    <u>EXPIRATION DATE</u>: May 1, 2014.

CR-1090

Subject: UNIFORM DISCIPLINARY PROCEDURES

1. To remove funds from an inmate trust fund account in order to fulfill an unpaid financial obligation of the inmate, for fees and costs associated with the filing of frivolous or malicious claims, of if the inmate objects to the removal of funds and a garnishment order has not yet been issued.

2. For a Criminal Injuries Compensation Fund privilege tax assessed against an inmate that was not paid prior to the inmate's arrival at a TDOC institution. As provided by TCA 40-24-107(b), this assessment may be withdrawn from an inmate's account without a non-disciplinary due process hearing upon receipt of a certified statement from the convicting court clerk indicating the amount owed by the inmate. (See Policy #208.03)

3. To terminate an inmate from work release.

4. Recommendation of the Warden or Commissioner's designee at privately managed facilities for administrative segregation placement. (See Policy #404.10)

I. <u>Preponderance of Evidence</u>: The amount of evidence necessary for a party to prevail at a disciplinary hearing. The degree of proof which best accords with reason and probability and is more probable than not.

J. <u>Staff Advisor</u>: Staff appointed by the Warden to provide assistance to inmates who have been charged with disciplinary infractions.

K. <u>Warden's Designee</u>: For purposes of this policy only, the designee at TDOC managed facilities can be the Deputy Warden, Associate Warden of Operations, or shift supervisor. The designee at privately managed facilities can be the Assistant Warden or Chief of Security.

L. <u>Working Days</u>: The days during which the institutional administrative offices are open for business, normally Monday through Friday. Holidays are excluded.

V. POLICY: Fair and impartial disciplinary proceedings will be administered against inmates charged with disciplinary infractions. The procedures contained herein alone shall govern the disciplinary process. This policy is not intended to create any additional rights for inmates beyond those which are constitutionally required. Minor deviations from the procedures set forth below shall not be grounds for dismissal of a disciplinary offense unless the inmate is able to show substantial prejudice as a result and that the error would have affected the disposition of the case.

VI. PROCEDURES:

A. The Disciplinary Board

1. Each Warden shall appoint a minimum of six institutional employees who shall serve as members of the disciplinary board to hear all Class A disciplinary offenses and Class B offenses for which accumulated sentence credits may be taken, i.e., where good conduct credits are applied to an inmate's sentence. (Accumulated Prisoner Performance Sentence Credits (PPSC) and Prisoner Sentence Reduction Credits (PSRC) may not be taken for Class B infractions)

**Westlaw.**

**c**
West's Tennessee Code Annotated Currentness
  Title 33. Mental Health and Intellectual and Developmental Disabilities
    Chapter 2. Services and Facilities (Refs & Annos)
      Part 4. Mental Health, Alcohol and Drug Abuse Prevention and/or Treatment, Intellectual and Developmental Disabilities, and Personal Support Services Licensure Law
        →→ § 33-2-416. Serious abuse, dereliction or deficiency in operation of facility; license suspension or revocation

(a) The department shall investigate reports of serious abuse, dereliction or deficiency in the operation of a licensed service or facility.

(b)(1) A person making any report or investigation pursuant to this part, including representatives of the department in the reasonable performance of their duties and within the scope of their authority, shall be presumed to be acting in good faith and shall be immune from any liability, civil or criminal, that might otherwise be incurred or imposed.

(2) Any such person shall have the same immunity with respect to participation in any judicial proceeding resulting from the report or investigation.

(3) Any person making a report under the provisions of this part shall have a civil cause of action for appropriate compensatory and punitive damages against any person who causes a detrimental change in the employment status of the reporting party by reason of the report.

(c)(1) The commissioner shall suspend or revoke the license of any service or facility if serious abuse, dereliction or deficiency is found and not corrected in a reasonable time.

(2) The commissioner, in the commissioner's discretion, may suspend enrollment in a service or facility pending resolution of the investigation or of proceedings to suspend, revoke, or deny the license, or until the service or facility corrects any serious abuse, dereliction, or deficiency found in the course of the investigation. The commissioner may suspend enrollment in a licensed service or facility based on probable cause to believe that serious abuse, dereliction, or deficiency in the operation of the licensed service or facility has occurred or would occur without suspension of enrollment. Suspension of enrollment shall not exceed a period of one hundred twenty (120) days except that, in the discretion of the commissioner, the period may be extended for an additional period not to exceed one hundred twenty (120) days. Nothing in this part takes away from the right of the department to issue an order of summary suspension of the license pursuant to § 4-5-320(c) and (d).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

West's Tennessee Code Annotated Currentness
  Title 41. Correctional Institutions and Inmates
    ▶■ Chapter 1. Penitentiary
      ▶■ Part 1. General Provisions
        ➡➡ § 41-1-114. Commissioner; reports; general assembly



The commissioner shall transmit to the general assembly, at each regular session of that body and during the first week of the session, a report in full of the transactions of the penitentiary during the two (2) years preceding the report, and showing, among other things:

(1) The number of inmates confined in the penitentiary;

(2) The offenses for which committed;

(3) Their ages, previous occupation, birth place and residence;

(4) Their respective periods of imprisonment;

(5) The different kinds of businesses in which they are employed;

(6) How many employed in each; and

(7) The profit or loss.

CREDIT(S)

1829 Acts, c. 38, § 13; impl. am. by 1883 Acts, c. 171, § 21; impl. am. by 1895 Acts (Ex. Sess.), c. 7, § 21; impl. am. by 1897 Acts, c. 125, § 1; impl. am. by 1915 Pub.Acts, c. 20, § 9; impl. am. by 1919 Pub.Acts, c. 39, §§ 1, 2; impl. am. by 1923 Pub.Acts, c. 7, § 42.

Formerly 1858 Code, § 5460; Shannon's Code, § 7477; 1932 Code, § 12075; § 41-131.

LIBRARY REFERENCES

Prisons ⬤⇒ 9.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

West's Tennessee Code Annotated Currentness
Title 41. Correctional Institutions and Inmates
Chapter 1. Penitentiary
Part 1. General Provisions
→→ **§ 41-1-113. Commissioner; reports; governor**

The commissioner shall report to the governor, forthwith, all violations of law or omissions or neglect of duty by the warden or other officers and employees about the penitentiary.

CREDIT(S)

Impl. am. by 1895 Acts (Ex. Sess.), c. 7, § 21; impl. am. by 1897 Acts, c. 125, § 1; impl. am. by 1915 Pub.Acts, c. 20, § 9; impl. am. by 1919 Pub.Acts, c. 39, §§ 1, 2; impl. am. by 1923 Pub.Acts, c. 7, § 42.

**Formerly** 1858 Code, § 5459; Shannon's Code, § 7476; mod. 1932 Code, § 12074; § 41-130.

LIBRARY REFERENCES

Prisons €══ 9.
Westlaw Topic No. 310.
C.J.S. Prisons and Rights of Prisoners §§ 14 to 20.

T. C. A. § 41-1-113, TN ST § 41-1-113

Current through end of 2012 Second Reg. Sess.

(c) 2012 Thomson Reuters.

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

West's Tennessee Code Annotated Currentness
Title 41. Correctional Institutions and Inmates
 Chapter 21. Inmates
  Part 4. Punishment of Inmates
   → → § 41-21-408. Violence; reports

(a)(1) The warden or chief administrative officer of each correctional facility owned or operated by the department of correction shall forward a report detailing all acts of violence committed by or against any guard, employee or inmate in the facility to the district attorney general of the judicial district in which the violent act occurred.

(2) The report shall include, as to each act of violence, a copy of any internal investigation report prepared, the results of any disciplinary committee hearing and any disciplinary action taken concerning the act of violence.

(b) If the release of the information would endanger or compromise the security of any inmate or the security of the institution, the warden or chief administrative officer shall have the discretion to classify the information and maintain the confidentiality of the information.

CREDIT(S)

1982 Pub.Acts, c. 659, § 1.

Formerly § 41-728.

LIBRARY REFERENCES

Prisons ⬤⟹ 9.
Westlaw Topic No. 310.
C.J.S. Prisons and Rights of Prisoners §§ 14 to 20.

UNITED STATES SUPREME COURT

*Rights of prisoners,*

Medical treatment, see Estelle v. Gamble, U.S.Tex.1976, 97 S.Ct. 285, 429 U.S. 97, 50 L.Ed.2d 251, rehearing denied 97 S.Ct. 798, 429 U.S. 1066, 50 L.Ed.2d 785, on remand 554 F.2d 653.

T. C. A. § 41-21-408, TN ST § 41-21-408

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.


I.     <u>AUTHORITY:</u> TCA 4-3-603, TCA 4-3-606, and TCA 39-16-402.

II.     <u>PURPOSE:</u> To establish guidelines for employee and offender interaction.

III.     <u>APPLICATION:</u> To all Tennessee Department of Correction (TDOC) staff, inmates, volunteers, Tennessee Rehabilitative Initiative in Corrections (TRICOR) staff, employees of privately managed institutions, contract employees and vendors, and interns.

IV.     <u>DEFINITIONS:</u>

     A.     <u>Employee:</u> For purposes of this policy only, an employee is considered to be any individual employed by the TDOC, any individual serving as a volunteer to the Department, any contract employee, any vendor providing professional services to the Department, any TRICOR employee, and any intern.

     B.     <u>Offender:</u> For purposes of this policy, any incarcerated inmate, any person currently on active probation or parole supervision, or any former inmate who has been discharged from TDOC custody or probation/parole supervision for less than one year.

     C.     <u>Sexual Abuse:</u> The subjection of another person to any sexual act or contact between an employee, volunteer, visitor, or agency representative by force, persuasion, inducement, or enticement.

     D.     <u>Sexual Contact:</u> The intentional touching of another individual or of the individual's intimate parts and/or clothing covering the individual for the purpose of sexual arousal or gratification.

     E.     <u>Sexual Harassment:</u> Any unwelcome or unsolicited sexual advances, requests for sexual favors, or other verbal, written, or physical conduct of a sexual nature by a manager, supervisor, co-worker, or non-employee (third party).

     F.     <u>Sexual Misconduct:</u> Any unwanted behavior or unwanted act of a sexual nature directed towards any individual by an employee, volunteer, visitor, or agency representative.

V.     <u>POLICY:</u> Interaction between TDOC employees and offenders shall be only of a professional nature. All offenders shall be treated equally in a non-discriminatory manner.

VI.     <u>PROCEDURES:</u>

     A.     Employees shall conduct themselves in a professional manner when interacting with offenders.

2. The collection and review of data concerning compliance as outlined in the TDOC Title VI plan, at the direction of the Commissioner.

3. The completion of Program Participation - Title VI Tracking, CR-3546, that will be submitted on a quarterly basis by institutional staff to the TDOC Title VI Coordinator who will ensure that the Director of Decision Support: Research and Planning receives a copy by the 15th day of January, April, July, and October.

F. The TDOC, through the Central Office Title VI Coordinator shall maintain a Title VI implementation plan and submit annual compliance reports and plan updates to the Tennessee Human Rights Commission Title VI Compliance Program by October 1 of each year. A copy of the updated plan shall also be provided to each institution for use by the Title VI Site Coordinator and other staff, as necessary.

G. The right of a person to a prompt and equitable resolution of a complaint filed relating to Title VI shall not be impaired by the person's pursuit of other remedies such as the filing of a complaint(s) with the responsible federal department or agency. Use of the TDOC grievance procedure is not a prerequisite to the pursuit of other remedies, but is highly encouraged.

H. New employees shall receive training regarding the requirements of Title VI during orientation. Current employees shall receive training during their annual in-service. Additionally, subrecipients must provide Title VI training to their staff. This training may be administered by the use of lesson plans and/or outlines; training will be reviewed and approved by TDOC annually.

I. Inmates under the supervision of the TDOC shall be provided information relative to Title VI during their orientation. (See Policy #404.05) Information shall also be included in the inmate rulebook and visitor handbooks. Notices regarding Title VI requirements and complaint procedures shall be posted in inmate living areas and in visitation areas.

J. A *Title VI Site Coordinator's Manual* shall be maintained and updated which includes the following sections:

1. Title VI of the Civil Rights Act of 1964
2. Omnibus Crime Control and Safe Streets Act of 1964
3. State of Tennessee Executive Order No. 34
4. Limited English Proficiency
5. Elements of Effective Plan on Language Assistance for Limited English Persons
6. *Title VI Legal Manual*
7. *Title VI Investigation Procedures Manual*
8. Institutional Tracking Data (demographics)
9. Compliance and Review Data
10. Updates

K. All institutions shall ensure that Limited English Proficiency (LEP) inmates have access to programs and activities as required in Title VI of the Civil Rights Act of 1964. Provisions for language assistance for LEP inmates shall include, but not be limited to, the following:

# Tennessee Correction Academy





**P.O. Box 1510**
**1314 South Jackson Street**
**Tullahoma, Tennessee 37388**
**(931) 461-7100**
**Fax (931) 454-1940**

## Superintendent Gerald McAllister
## <u>Biography</u>

*...Preparing Proud Professionals...*

"If excellence is the goal of our profession and the organizations to which we belong, then nothing less than excellence in our training and staff development efforts are acceptable...

...A correctional training academy must be the epitome of correctional professionalism, and must be perceived as such by those it serves."

*Perry M. Johnson, Past President,*
*American Correctional Association*

Biography

...Preparing Proud Professionals...

-----------------------------------------------------------------------------

"If excellence is the goal of our profession and the organizations to which we belong, then nothing less than excellence in our training and staff development efforts are acceptable...

...A correctional training academy must be the epitome of correctional professionalism, and must be perceived as such by those it serves."

Perry M. Johnson, Past President,
American Correctional Association

-----------------------------------------------------------------------------

Our Mission

To ensure state of the art training to all employees whom we have the opportunity to serve.

Our Vision

The Tennessee Correction Academy, through a focus on professional service, will set the example for excellence in the delivery of criminal justice training.

Our Goals

To make training a clear priority --- To implement a targeted training system
To maintain a quality training environment.

Academy

•TCA Home
•Contact Directory
•About the Academy
•TCA Photo Gallery

# Commissioner Derrick D. Schofield



Derrick D. Schofield has served as Commissioner of the Tennessee Department of Correction (TDOC) since 2011. He is a nationally recognized leader in corrections and previously served as Assistant Commissioner and Chief of Staff of the Georgia Department of Corrections.

As Commissioner of the TDOC, Schofield oversees 14 prisons, a training academy and headquarters. He is responsible for more than 30,000 offenders, 5,000 employees and an operating budget of more than $800,000,000.

Commissioner Schofield has twenty years of correctional experience, having served in various positions including Warden, Facility Operations Director and Director of Investigations and Compliance.

Prior to his career in corrections, Schofield served in the United States Army where he reached the rank of Captain. He holds a Bachelor of Arts Degree in Policital Science from Fort Valley State University and Master's Degree in Public Administration from Georgia's Law Enforcement Command College and Columbus State University.

Schofield serves on the performance measures, racial disparity, substance abuse and mental health committees of the Association of State Correctional Administrators. He also serves on the board of directors of the Tennessee Corrections Institute (TCI), the Tennessee Rehabilitative Initiative in Correction (TRICOR) and is a member of the advisory board of Big Brothers Big Sisters of Middle Tennessee.

http://www.tn.gov/correction/commissioner.html                                8/16/2013

**RECEIVED**

APR − 8 2015

8.16.13.

U.S. DISTRICT COURT
MIDDLE DISTRICT OF TN.

**STATEMENT OF YOUR CIVIL CLAIM**



1. Hello.

2. My name is Tyree C. Smith.

3. I'm a African-American.

4. On 8.15.13, I was released from the River bend Maximum Security Institution ("RMSI") of the Tennessee Department of Correction in Nashville, Tennessee.

5. On 2.29.08, C/O Jeremy Gooch had filed and falsified an "Assault on Staff" disciplinary report against me at the Northwest Complex institution ("NWCX") of the Tennessee Department of Correction.

6. In cahoots, the NWCX disciplinary chairperson ("Sgt. Cagle") had recommended for me to be placed on Maximum Security for the "Assault on Staff" disciplinary report that C/O Jeremy Gooch had (cold-bloodedly) filed and falsified against me.

7. Never once within my whole entire life have I ever committed any type of an "Assault" against C/O Jeremy Gooch at the NWCX institution.

8. I even tried to file an prison complaint against C/O Jeremy Gooch for filing and falsifying an "Assault on Staff" disciplinary report against me.

9. But the NWCX grievance chairperson ("Sgt. Cynthia Casagrande") wouldn't allow me to do so by no means.

10. As a matter of fact, during the time when the (so-call) assault incident was taking place between C/O Jeremy Gooch and I, I was viciously and sadistically sprayed in both of my eyes with a very large portion of "mace" by C/O F. Thomas, through the "pie-flap" of my (assigned) cellroom door.

11. Shortly, after C/O F. Thomas had sprayed me in both of my eyes with mace, I was escorted to the NWCX infirmary to get the both of my eyes "checked" by the NWCX registered nurses.

12. Because, both of my eyes was really burning very badly from the mace.

13. Afterwards, when I was escorted back to my (assigned) housing unit from the NWCX infirmary, "Racist" Corporal Christopher Morris had "re-approached" my cellroom door and looked directly at me and started smiling at me as if he was very "ecstatic" to see me (currently) going through such a very "rough" and "difficult" time with C/O Jeremy Gooch.

14. Cpl. Christopher Morris never liked me in the first place.

15. And it wasn't just because of the color of my skin that Cpl. Christopher Morris hated, but because Cpl. Christopher Morris and I have had several conflicts between each other in the past as well before the (so-call) incident ever occurred between C/O Jeremy Gooch and I inside unit one.

16. **Cpl. Christopher Morris called me a "Nigger" once upon a time before inside unit one when I was serving a little "punitive time" in segregation where the "Pending" protective custody's inmates use to be housed at back in 2007 and 2008.**

17. However, practically, each and every single day when I was "locked down" on Maximum Security, not only was I experiencing a lot of "Hurt" and "Stress" while being locked down on Maximum Security, but in a very big strange way I felt very betrayed as well.

18. Because, it seemed like no matter how hard I'd tried to overcome the "thought" of how C/O Jeremy Gooch had filed and falsified an "Assault on Staff" disciplinary report against me so cold-bloodedly, just the "thought" of it within itself was just so "unethical" and "unconstitutional" to me.

19. Even now as I speak, I still feel "victimized" about it as well if you know what I mean?

20. As a matter of fact, the whole entire time while I was locked down on Maximum Security, I have lost (because of C/O Jeremy Gooch) a lot of my hair on the top of my head from being all "worried" and "stressed out" on Maximum Security.

21. I was locked down on Maximum Security for nearly 6 (miserable) years, all the way until I was released from the TDOC on 8.15.13.

22. Anyhow though, on 9.21.12, I was shipped from the Lois De berry Special Needs Facility ("DSNF") to the RMSI institution.

23. I think about 2 months or so before I was shipped from the DSNF institution to the RMSI institution on 9.21.12, technically, Cpl. Dennis Davis use to be the current DSNF grievance chairperson when I (within my entire life) first time ever trying to file a prison complaint against a significant amount of ("Criminal Active") DSNF staff members that were normally assigned to the unit 7 building of the DSNF institution between the years of 2010 and 2012.

24. Unfortunately, due to me not providing any "actual names" of the significant amount of the (criminal active) DSNF staff members that I was referring to within those particular (proposed) prison complaint of mine that I use to forward to Cpl. Dennis Davis inside the "grievance box" of unit 7-F, Cpl. Dennis Davis therefore use to "deem" those particular (proposed) prison complaints of mine as: "Inappropriate to the grievance procedure".

25. And then afterwards, Cpl. Dennis Davis use to return those same particular (proposed) prison complaints of mine back to me shortly through the via mail of the DSNF institution, after he finished reviewing them.

26. As a matter of fact, this particular matter took place several times.

27. However, eventually I started to provide "actual names" of the significant amount of (criminal active) DSNF staff members that I was referring to within those previous (proposed) prison complaint of mine forwarded to Cpl. Dennis Davis previously.

28. And once I started providing "actual names" of the significant amount of (criminal active) DSNF staff members that I was referring to within those particular and previous (proposed) prison complaint of mine to Cpl. Dennis Davis, that's when all of a sudden then, Sgt. Julia Campbell started reviewing those particular (proposed) prison complaints of mine instead of Cpl. Dennis Davis or Mrs. Natasha Holt reviewing them.

29. Collectively though, to be a little more specific within this civil claim about the amount of the significant (criminal active) DSNF staff members that I was referring to within those particular and previous (proposed) prison complaints of mine to Cp. Dennis Davis and to Sgt. Julia Campbell eventually, it was between 10 and 25 (criminal active) DSNF staff members whose names were indicated into those particular and previous (proposed) prison complaints of mine.

30. And each time (eventually) when I use to forward a (proposed) prison complaint to Sgt. Julia Campbell regarding about those significant amount of (criminal active) DSNF staff members that were normally assigned to the unit 7 building of the DSNF institution between the years of 2010 and 2012, Sgt. Julia Campbell would return that very same particular (proposed) prison complaint of mine back to me eventually, with a "grievance notification" sheet that was highlighted and attached to that very same particular (proposed) prison complaint of mine as the grievance notification sheet would also show and indicate about that particular (proposed) prison complaint of mine was deemed as: "Inappropriate to the grievance procedure".

31. Apparently, and according to the grievance notification sheet as well, Sgt. Julia Campbell wanted me to provide more "specifics" and "details" within that particular (returned) proposed prison complaint of mine before returning it back to her (re-prepared) through the grievance box of unit 7-F.

32. So, therefore, I re-prepared/provided more "specifics" and "details" within that particular (returned) proposed prison compliant of mine before returning it back to Sgt. Julia Campbell through the grievance box of unit 7-F.

33. Unfortunately though, that particular (returned) proposed prison complaint of mine still wasn't processed/exhausted through the DSNF grievance procedure after I'd re-prepared it and returned it back to Sgt. Julia Campbell through the grievance box of unit 7.

34. But, it seemed like no matter how many times I would re-prepare/add more "specifics" and "details" within that particular (returned) proposed prison complaint of mine before returning it back to Sgt. Julia Campbell through the grievance box of unit 7, that particular (returned) proposed prison complaint of mine was always and eventually returned back to me with a grievance notification sheet that was attached to it (and highlighted) as it would show and indicate about that particular (returned) proposed prison complaint of mine was deemed (again) as: "Inappropriate to the grievance procedure".

35. A few times it made me a little frustrated.

36. Especially, after when I'd just finished re-preparing it and forwarded it straight back to Sgt. Julia Campbell afterwards.

37. However, like I said, "Crooked" Cpl. Dennis Davis use to be the DSNF grievance chairperson that use to review my (proposed) prison complaints at first.

38. And sometimes, Mrs. Natasha Holt as well.

39. But then all of a sudden, Sgt. Julia Campbell became the DSNF grievance chairperson and started reviewing my (proposed) prison complaints.

40. However, I at least re-prepared that particular (returned) proposed prison complaint of mine several times (in all) before I was ever shipped from the DSNF institution to the RMSI institution on 9.21.12..

41. As a matter of fact, in regards to the **VERY LAST** (proposed) prison complaint of mine that I'd "re-prepared" (again) against those same particular and significant amount of ("criminal active") DSNF staff members before I was shipped from the DSNF institution to the RMSI institution on 9.21.12, any time when I would see Sgt. Julia Campbell present inside of unit 7-F while she were conducting an inmate's "grievance hearing" or just normally "checking" the grievance box of unit 7-F, I would call Sgt. Julia Campbell's name for her to approach my cellroom door and I would practically beg and question Sgt. Julia Campbell about returning that (very last) particular and previous proposed prison complaint of mine back to me real soon that I'd re-prepared and forwarded to her.

42. Especially, if she already knew deep down inside her mind (without a doubt) that she was going to return that (very last) particular and previous proposed prison complaint of mine back to me (eventually) deemed as: "Inappropriate to the grievance procedure".

43. **All of the OTHER PREVIOUS ("returned") proposed prison complaints of mine that I'd filed once before against those particular and significant amount of (criminal active) DSNF staff members that were normally assigned to the unit 7 building of the DSNF institution between the years of 2010 and 2012, each one of those particular and previous ("returned") proposed prison complaints of mine that I'm speaking of was returned back to me ("deemed") from Sgt. Julia Campbell very shortly.**

44. **But now all of a sudden mysteriously, it's taking Sgt. Julia Campbell almost a "lifetime" just to return that (very last) particular and previous proposed prison complaint of mine back to me that I'd re-prepared and forwarded to her against those particular and significant amount of (criminal active) DSNF staff members that were normally assigned to the unit 7 building of the DSNF institution between the years 2010 and 2012.**

45. **So, therefore at number #43 and #44, that was the sole purpose of me practically begging and questioning Sgt. Julia Campbell about returning that (very last) particular and previous proposed prison complaint of mine that I'd re-prepared and forwarded to her a few weeks just before I where shipped from the DSNF institution to the RMSI institution on 9.21.12..**

46. However though, upon my suspicion regarding to one of the very main reasons why I truly believe Sgt. Julia Campbell didn't really want to return that (very last) particular and previous proposed prison complaint of mine that I had re-prepared and forwarded to her through the grievance box of unit 7- F, was strictly because of the descriptions, witnesses, times, dates, and the locations of the "Illegal Activities" that were not only committed inside the unit 7 building of the DSNF institution by those particular and significant amount of (criminal active) DSNF staff members that were normally assigned to the unit 7 building at the DSNF institution between the years of 2010 and 2012, but all of those same particular "Illegal Activities" with all the descriptions, witnesses, times, dates, and the locations of them that I'm speaking of right now was also indicated within that (very last) particular and previous prison complaint of mine as well that I'd forwarded to Sgt. Julia Campbell through the grievance box of unit 7-F.

47. Allegedly, Sgt. Julia Campbell felt very "guilty" about that (very last) particular and previous proposed prison complaint of mine that I'm speaking of at number #45.

48. And one of the reasons why I stated (at number#46) that Sgt. Julia Campbell felt "guilty" about that (very last) particular and previous proposed prison complaint of mine was simply because Sgt. Julia Campbell (herself) had probably participated into "Illegal activities" as well with some of those particular and significant amount of (criminal active)

DSNF staff members that were normally assigned to the unit 7 building at the DSNF institution between the years of 2010 and 2012.

49. All I'm saying, is there's a very strong "plausibility" that it might be true.

50. But still, allegedly, in some type of shape, form, or fashion, Sgt. Julia Campbell already had "Personal Knowledge" of the "Illegal activities" that were being committed inside the unit 7 building of the DSNF institution by those particular and significant amount of (criminal active) DSNF staff members that were normally assigned to the unit 7 building between the years of 2010 and 2012.

51. So, therefore, upon my suspicion regarding to number #46, #48, #49, and #50, those are some of the main reasons why I truly believe (deep down within Sgt. Julia Campbell's heart) why Sgt. Julia Campbell didn't really want to return that (very last) particular and previous proposed prison complaint of mine back to me any time real soon or any time at all.

52. However though, the last time when I "questioned" Sgt. Julia Campbell about that (very last) particular and previous proposed prison complaint of mine that were taking her so doggone long (**THAN USUAL**) to return back to me in a good reasonable amount of time, that's when Sgt. Julia Campbell (verbally) responded back to me as she were posted up at my cellroom door and told me that she have given that (very last) particular and previous proposed prison complaint of mine to "Warden Jewel Steele" for Warden Jewel Steele could review it.

53. Which, at that exact particular point I felt very "skeptical" about that particular recent information that I'd just received from Sgt. Julia Campbell at my cellroom door of unit 7-F #110 cell.

54. And the reason why I felt that particular way, was becasue something about that particular recent information that Sgt. Julia Campbell had just recently informed me of, I just couldn't shake the feeling and detect that something very "strange" and "sneaky" was going on between Sgt. Julia Campbell and Warden Jewel Steele at that exact particular point?

**55. Especially, when Sgt. Julia Campbell couldn't really look me in my eyes during that exact particular moment as she was informing me of that particular recent information that she was informing me of.**

**56. However, that right there (of number#55) automatically made my "antennas" rise up at the top of my head for some strange reason?**

57. Sgt. Julia Campbell is a very big liar, and filled with a lot of deception.

58. So, therefore, to make a long story short, I proceeded to send an "In-house" written letter directly to Warden Jewel Steele about that (very last) particular and previous proposed prison complaint of mine that Sgt. Julia Campbell (supposedly) gave to her.

59. I think a few days after when I had sent an "In-house" written letter to Warden Jewel Steele about that (very last) particular and previous proposed prison complaint of mine, that's when that (very last) particular and previous proposed prison complaint of mine was returned back to me (from Warden Jewel Steele/Sgt. Julia Campbell) deemed as: "Inappropriate to the grievance procedure".

60. However though, to make a long story short, before I could re-prepare (again) that (very last) particular and previous proposed prison complaint of mine that was returned back to me from Warden Jewel Steele/Sgt. Julia Campbell while I was still located at the DSNF institution, I was (unexpectedly) shipped from the DSNF institution to the RMSI institution all of a sudden, on 9.21.12.

61. **And once I got "fully situated" upon my arrival at the RMSI institution from the DSNF institution, that's when I (immediately) "re-prepared" that very same particular and previous (proposed) prison complaint of mine again.**

62. **And then once I finally got finished re-preparing it, that's when I'd mailed it** DIRECTLY **to Sgt. Julia Campbell through the U.S. mail with** PRECISELY **4 "American Flag" postage stamps that were (heavily) attached on the front of a ("9 ½ x 12 ½") legal manila envelope that I'd placed that very same particular and previous proposed prison complaint of mine inside of, once I was completely finished re-preparing it (11.8.12. Unit 4–C #105cell 3rd shift RMSI institution).**

63. As a matter of fact, within that very same particular ("outgoing") proposed prison complaint of mine that I'm speaking of at number #62, I even written down a "Excessive force" incident that took place against a Max Prisoner ("Tommy Hollars") by Nurse Consandra Hughes, C/O R. Tidwell, and C/O H. Alexander on (9.4.12 unit 7-F #112cell B-shift).

64. However though, at number #62, right today, Sgt. Julia Campbell and the DSNF officials still remains in complete denial of receiving that very same particular ("outgoing") proposed prison complaint of mine that I'd mailed **DIRECTLY** to Sgt. Julia Campbell through the U.S. mail from the RMSI institution on 11.8.12.

65. Which, allegedly, I know for a **FACT** that Sgt. Julia Campbell (in some type of shape, form, or fashion) did receive that particular ("outgoing") proposed prison complaint of mine that I'd mailed to her through the U.S. mail from the RMSI institution on 11.8.12.

66. One way or the other, I'm very certain Sgt. Julia Campbell received that particular (outgoing) proposed prison complaint of mine that I'd mailed to her through the U.S. mail from the RMSI institution on 11.8.12.

67. **I might can't prove it, but I know doggone well that she did.**

68. As a matter of fact, I put that on the both of my grandson's precious life that she did.

69. **However though, regarding to this whole entire particular matter about that particular (outgoing) proposed prison complaint of mine that I'd mailed to Sgt. Julia Campbell through the U.S. mail from the RMSI institution on 11.8.12, most likely Sgt. Julia Campbell will definitely "concoct" some type of big fat vicious lie, excuse, and/or exaggeration to try to keep herself "in the clear" of this entire civil legal case that I'm pursing against the defendants/the TDOC.**

70. **And, "others" as well if you know what I mean?**

71. **Regarding to that particular (outgoing) proposed prison complaint of mine that I'd mailed to Sgt. Julia Campbell through the U.S. mail from the RMSI institution on 11.8.12, it was very "Deceitful" and "Unconstitutional" for Sgt. Julia Campbell not to process/exhaust that particular (outgoing) proposed prison complaint of mine through the DSNF grievance procedure when I'd mailed it to her through the U.S. mail from the RMSI institution on 11.8.12.**

72. **So, therefore, by any chance if I wish to pursue this civil litigation all the way to the very end of trial and succeed at it, I, therefore, vigorously will like for Sgt. Julia Campbell to be "Criminal Prosecuted" just as well as the rest of the defendants involved in this case.**

73. And for each and every single one of them, I want their "Pension" to be terminated away from them.

74. I even filed several prison complaints against Sgt. Julia Campbell personally, for not processing/exhausting that particular (outgoing) proposed prison complaint of mine through the DSNF grievance procedure that I'd mailed to her through the U.S. mail from the RMSI institution on 11.8.12.

75. However though, all of a sudden now, Cpl. Ty Parker (miraculously) becomes the DSNF grievance chairperson around about the time when Sgt. Julia Campbell (miraculously) got promoted as Sergeant??????

76. However though, to make a long story short, I had to take some very "rough" and "hindering" steps in order to show and have proof in the long run that my "Administration Remedies" were (finally) exhausted through the DSNF grievance procedure against those particular and significant amount of (criminal minded) DSNF staff members

that were normally assigned to the unit 7 building of the DSNF institution between the years of 2010 and 2012.

77. **And basically, the only way I could have anything written down on paper showing as proof of me complaining against those particular and significant amount of (criminal active) DSNF staff members that were normally assigned to the unit 7 building at the DSNF institution between the years of 2010 and 2012 was for me to file a prison complaint against Sgt. Julia Campbell personally.**

78. And that's exactly what I done in order to have proof in the long run of it.

79. Because, at first in the very beginning, the prison complaint that I'd filed against Sgt. Julia Campbell for her not processing/exhausting that particular (outgoing) proposed prison complaint of mine through the DSNF grievance procedure when I'd mailed it to her through the U.S. mail from the RMSI institution on 11.8.12, Cpl. Ty Parker (in cahoots) kept returning that very same particular (outgoing) proposed prison complaint of mine back to me after I'd mailed it to him through U.S. mail for him to process it/exhaust it through the DSNF grievance procedure.

80. **Under no circumstances none what's so ever, Cpl. Ty Parker wasn't going to process/exhaust that particular (outgoing) proposed prison complaint of mine that I was trying to file against Sgt. Julia Campbell until the RMSI grievance chairperson ("Sgt. Gregory Leonard") had to practically force and "pursuant" the TDOC grievance procedure and policy to Cpl. Ty Parker on a "Memorandum" notification sheet in order to make Cpl. Ty Parker to process/exhaust that particular prison complaint of mine that I was trying to file (by mail) against Sgt. Julia Campbell through the DSNF grievance procedure.**

81. Because, otherwise, if it wasn't for Sgt. Gregory Leonard practically forcing Cpl. Ty Parker to abide by the TDOC grievance procedure and policy, Cpl. Ty Parker would have not allowed my "Administration Remedies" against Sgt. Julia Campbell to be exhausted through the DSNF grievance procedure under no circumstances none what's so ever.

82. So, therefore, allegedly, I truly believe Sgt. Julia Campbell and Warden Jewel Steele had "game planned" against me before I was shipped from the DSNF institution to the RMSI institution on 9.21.12..

83. And right today as well, I still truly feel if Sgt. Julia Campbell would've just went ahead (from the very beginning) and "processed/exhausted" that particular (outgoing) proposed prison complaint of mine that I'd mailed to her through the U.S. mail from the RMSI institution on 11.8.12, I probably would've been able to pay (by my uncle) the "Federal Civil Filing Fee" in a timely manner while I was still "confined" at the RMSI institution.

84. **Besides, several times, I have already corresponded/addressed this whole entire particular "illegal matter" to the Clerk's office of the Middle District Court when I was still confined at the RMSI institution.**

85. However though, like I said earlier, I was shipped from the DSNF institution to the RMSI institution on 9.21.12.

86. Max Prisoner Courtney Stroggins and I had got into a heated argument with each other outside in the rec. age area at the DSNF institution on 3.28.12 (Approx. 12:30p.m. unit 7-F rec. cage area DSNF).

87. Mr. Courtney Stroggins and I was inside separate "secured" rec. cages during the time.

88. Max Prisoner Marcus Wright and Max Prisoner Charles Nelson had got into a heated argument with each other outside as well as Mr. Courtney Stroggins and I was continuing arguing with each other at the same time through the rec. cage fence.

89. Mr. Marcus Wright and Mr. Charles Nelson was also inside separate rec. cages during the time as well.

90. However, about an hour or so, C/O T. Perkins and C/O J. Champaco had entered into the rec. cage area to escort the "4 of us" (one by one) back to each of our (assigned) cellroom of unit 7-F.

91. "Each of our" recreation time had expired for that particular day (3.28.12 approx. 3:05 p.m. 2ND shift unit 7-F rec. area DSNF).

92. However, suddenly, as soon as C/O T. Perkins and C/O J. Champaco had entered into the rec. cage area to escort each of us (one by one) to our (assigned) cellroom of unit 7-F, Mr. Marcus Wright quickly yelled and asked C/O T.Perkins and C/O J. Champaco would they allow Mr. Charles Nelson and him to go "toe to toe" with each other right now inside the same rec. cage?

93. Surprisingly, C/O T. Perkins and C/O J.Champaco quickly told Mr. Marcus Wright --------"yes".

94. And then suddenly, C/O T. Perkins proceeded to announce to the "4 of us" that C/O J. Champaco and him had to "pat down" each one of us first to make sure that none of us didn't have any concealed weapons within our possession before allowing us to engage into physical altercations with each other.

95. However though, coincidentally I guess, Mr. Marcus Wright's rec. cage door was just so happen to be "unsecured" already, ever since the 1st shift.

96. Because, unintentionally, Cpl. Anthony Reinitz and some other male Caucasian (trainee) staff member (on 1st shift) had made a mistake and didn't quite secure Mr. Marcus

Wright's rec. cage door all the way after they had escorted Mr. Marcus Wright to the rec. cage that Mr. Marcus Wright was escorted to by them.

97. Anyhow, C/O J. Champaco proceeded to "unsecure" Mr. Charles Nelson's rec. cage door to "pat down" Mr. Charles Nelson inside of Mr. Charles Nelson's rec. cage as C/O T. Perkins was already "patting down" Mr. Marcus Wright inside of Mr. Marcus Wright's rec. cage.

98. When C/O T. Perkins was finished "patting down" Mr. Marcus Wright inside of Mr. Marcus Wright's rec. cage, C/O T. Perkins proceeded then to "post up" in front of Mr. Marcus Wright's rec. cage door until C/O J. Champaco got finished "patting down" Mr. Charles Nelson inside of Mr. Charles Nelson's rec. cage.

99. And when C/O J. Champaco got finished "patting down" Mr. Charles Nelson inside of Mr. Charles Nelson's rec. cage, that's when C/O T. Perkins stepped aside and open up Mr. Marcus Wright's rec. cage door (wider) as Mr. Marcus Wright proceeded then to exit out the rec. cage that he was inside of and entered into Mr. Charles Nelson's rec. cage as the both of them (quickly) proceeded to fight each other very violently.

100. The physical altercation between Mr. Charles Nelson and Mr. Marcus Wright lasted approximately 5 of 6 minutes.

101. And as an result of the physical altercation that took place between Mr. Charles Nelson and Mr. Marcus Wright, Mr. Charles Nelson encountered a very horrible "Blood clot" injury in his right eye by Mr. Marcus Wright.

102. And if I can recall, I think Mr. Marcus Wright encountered no physical injuries by Mr. Charles Nelson.

103. However, after the physical altercation between Mr. Charles Nelson and Mr. Marcus Wright had ended, that's when C/O T. Perkins and C/O J. Champaco proceeded to "pat down" Mr. Courtney Stroggins and I, so that Mr. Courtney Stroggins and I could go "toe to toe" with each other inside the same rec. cage next.

104. After C/O T. Perkins and C/O J. Champaco finished "patting down" Mr. Courtney Stroggins and I, that's when I proceeded to exit out the rec. cage that I was inside of and entered into Mr. Courtney Stroggin's rec. cage as the both of us (quickly) proceeded to fight each other violently.

105. The physical altercation between Mr. Courtney Stroggins and I lasted approximately 3 or 4 minutes.

106. And as a result of the physical altercation that took place between Mr. Courtney Stroggins and I, I encountered a big "Knot" injury at the top of the left side of my forehead by Mr. Courtney Stroggins.

107. The second physical injury that I encountered by Mr. Courtney Stroggins was a "Nosebleed" injury from the right side of my nostril.

108. And then the third physical injury that I encountered (unintentionally) by Mr. Courtney Stroggins as well, was a severe injured pinky finger of my right hand.

109. And as I can clearly recall, I believe Mr. Courtney Stroggins encountered a very bad injury by me, of one of his right hand.

110. However though, to make a long story short, after the physical altercations had ended between the "4 of us", and when C/O T. Perkins and C/O J. Champaco had approached my rec. cage door to handcuff me and to escort me to my (assigned) cellroom of unit 7-F, that's when I (very broadly) instructed C/O T. Perkins and C/O J. Champaco to escort me DIRECTLY to the "Medical Triage Room" of unit 7-F as SOON as all 3 of us stepped a foot into unit 7-F from the rec. cage area so that the "A-shift Nurse" of unit 7-F could quickly examine my pinky finger of my right hand.

111. Because, during that exact particular moment when C/O T. Perkins and C/O J. Champaco was present at my rec. cage door to handcuff me and to escort me to my (assigned) cellroom of unit 7-F, my pinky finger of my right hand was hurting very severely during that exact particular moment.

112. And by all means necessary, I needed serious "Medical Attention" as soon as possible.

113. Because, my pinky finger of my right hand was hurting so very badly and it was swollen as well.

114. But under no circumstances none what's so ever, C/O T. Perkins and C/O J. Champaco would not escort me to the medical triage room of unit 7-F no matter how many times I would've told them/instructed them to do so.

115. So, therefore, I strongly consider that (of me) being denied "Medical Attention".

116. However, according to C/O T. Perkins and C/O J. Champaco in their very own words, the both of them indicated to me that I could get the both of them into serious trouble if they were to escort me to the medical triage room of unit 7-F.

117. C/O T. Perkins and C/O J. Champaco were "self-conscious" that if they would've escorted me directly to the medical triage room from the rec. cage area of unit 7-F, the "A-shift nurse" of unit 7-F would've got very curious and started questioning me right in front of them about the fresh big "knot" injury at the top of the left side of my forehead and my severe injured pinky finger of my right hand.

118. Subconsciously, C/O T. Perkins and C/O J. Champaco didn't want to take any chances at that particular moment of the A-shift nurse of unit 7-F of having any "assumptions" of how I actually and truthfully received those particular injuries of mine?

119. So, therefore, like I stated, C/O T. Perkins and C/O J. Champaco at that exact particular moment, refused to allow me to receive medical treatment of my pinky finger of my right hand from the A-shift nurse of unit 7-F.

120. As a matter of fact, as I was still in the process of being escorted to my (assigned) cellroom of unit 7-F by C/O T. Perkins and C/O J. Champaco, C/O T. Perkins and J. Champaco kept stating to me (in their own words) about some "coward ass shit" what I done to Mr. Courtney Stroggins outside in the rec. cage area when Mr. Courtney Stroggins and I was fighting each other.

121. It was very clearly to me when C/O T. Perkins and C/O J. Champaco kept stating to me about what I'd done to Mr. Courtney Stroggins during Mr. Courtney Stroggins and I physical altercation, C/O T. Perkins and C/O J. Champaco was strictly referring about when I'd kicked Mr. Courtney Stroggins in the face (recently ago) with my right shoe as C/O J. Champaco was pulling me up off of Mr. Courtney Stroggins from off the ground inside of Mr. Courtney Stroggin's rec. cage during Mr. Courtney Stroggins and I physical altercation between each other in the rec. cage area.

122. I was on top of Mr. Courtney Stroggins on the ground inside of his rec. cage for a quick three or four seconds during our physical altercation between each other.

123. And that's when C/O J. Champaco quickly came and pulled me up off of Mr. Courtney Stroggins inside of Mr. Courtney Stroggin's rec. cage.

124. Because, Mr. Courtney Stroggins quickly became "terrified" and yelled out for help.

125. So, therefore, C/O J. Champaco came to Mr. Courtney Stroggin's recuse.

126. As C/O J. Champaco was pulling me up off of Mr. Courtney Stroggins from off the ground inside of Mr. Courtney Stroggin's rec. cage like I said, that's when the "kicking" Mr. Courtney Stroggins in the face with my right shoe took place.

127. And mainly the reason why I kicked Mr. Courtney Stroggins in the face with my shoe as C/O J. Champaco was pulling me up off of Mr. Courtney Stroggins from off the ground inside of Mr. Courtney Stroggin's rec. cage, was strongly because I'd tried to take a great big swift punch at Mr. Courtney Stroggins in his face real quickly with my right fist while I was on top of him ( for a quick three or four seconds) and accidently hit the ground with my right fist, causing my pinky finger to become (mysteriously) injured in the process of it.

128. So, therefore, that was the reason why I'd kicked Mr. Courtney Stroggins in the face with my right shoe when C/O J. Champaco was pulling me up off of Mr. Courtney Stroggins.

129. Because, I became mad (instantly) the second when I felt the injury/the pain of my pinky finger of my right hand the very second when I accidently hit the ground with my right fist very hard.

130. So, therefore, like I said, that's the reason why I kicked Mr. Courtney Stroggins in the face when C/O J. Champaco proceeded to pull me up off of Mr. Courtney Stroggins from off the ground inside of Mr. Courtney Stroggin's rec. cage.

131. However though, to make a long story short, as C/O T. Perkins and C/O J. Champaco were escorting me to my (assigned) cellroom of unit 7-F from the rec. cage area, that's when C/O T. Perkins and C/O J. Champaco proceeded to instruct me to just wait until the both of them went home on the 3rd shift ("10:00 p.m.") in order for me to (finally) have a chance to be signed up on "sick call" and for the "B-shift Nurse" of unit 7-F to also examine my pinky finger of my right hand.

132. And then as me, C/O T. Perkins, and C/O J. Champaco was getting closer to my (assigned) cellroom of unit 7-F as they were escorting me, that's when C/O T. Perkins and C/O J. Champaco proceeded to tell me when I make it to my (assigned) cellroom, just go and lay down on my bunk and everything will be all right with me.

133. And then once C/O T. Perkins, C/O J. Champaco, and I finally made it all the way to my (assigned) cellroom of unit 7-F from me being escorted by them, and once C/O T. Perkins and C/O J. Champaco "unsecured" my (assigned) cellroom door for me to walk into of it afterwards, that's when C/O T. Perkins and C/O J. Champaco suddenly changed their minds and told me to just get prepared for shower.

134. Because, will they be returning back to my (assigned) cellroom door (momentarily) to escort me to the "shower area" for me to take a shower.

135. And momentarily, I was escorted to the shower area by C/O T. Perkins and C/O J. Champaco to take a shower.

136. However though, to make a long story short, due to C/O T. Perkins and C/O J. Champaco instructing me earlier to just wait until the both of them went home on the 3rd shift at night in order for me to sign up on "sick call" and to receive some medical attention from the "B-shift Nurse" of unit 7-F, I, therefore, had to suffer in deep pain and suffering within my cellroom without absolutely any type of medical treatment until C/O T. Perkins and C/O J. Champaco went home on 3rd shift at night.

137. So, about 45 minutes to an hour or so after C/O T. Perkins and C/O J. Champaco had went home on 3rd shift, that's when I (finally) got the attention of the "B-shift Nurse" of unit

7-F to approach my cellroom door, regarding about my (injured) pinky finger of my right hand.

**138.** **I reported my "pinky finger" injury to the B-shift nurse of unit 7-F and instructed her to sign me up on "sick call", regarding to my (injured) pinky finger of my right hand (2.28.12. Approx. 10:45 p.m. 7-F #110 cell DSNF).**

**139.** The B-shift nurse had given me some "ibuprofens" and signed me up on sick call.

140. As a matter of fact, I even sent several "In-house" written letter directly to the Physician Assistant ("David Sehorn") about my injured pinky finger of my right hand.

141. And not once (ever) did David Sehorn or any other DSNF medical official that I'd observed, of approaching my cellroom door regarding to my (injured) pinky finger of my right hand.

142. Allegedly, my pinky finger of my right hand was hurting very badly for about 15 days straight.

143. I hardly even slept at night a few times before.

144. As a matter of fact, on 4.5.12. Approx. 9:30 a.m., I was being "evaluated" by Nurse Practitioner Rhonda Thompson inside the "Treatment Team room" of unit 7-F.

145. After I were finished addressing (first) to Nurse Practitioner Rhonda Thompson inside the "Treatment Team room" that I was so ready for her to discharge me away from the DSNF institution immediately, that's when I proceeded next to address the "injury of my pinky finger" of my right hand to Nurse Practitioner Rhonda Thompson inside the "Treatment Team room".

146. After I were finished addressing the "injury of my pinky finger" of my right hand to Nurse Practitioner Rhonda Thompson inside the "Treatment Team room", Nurse Practitioner Rhonda Thompson **looked directly into my eyes and promised me** that she was going to contact the physician assistant ("David Sehorn") as soon as possible for him to come upstairs to unit 7- F to see about my (injured) pinky finger of my right hand.

147. Literally, Nurse Practitioner Rhonda Thompson actually promised me that she was going to contact David Sehorn as soon as possible to have him to come upstairs to unit 7-F to see about my pinky finger of my right hand.

148. And as a result of Nurse Practitioner Rhonda Thompson contacting David Sehorn, absolutely none during that whole entire particular day did I ever see one single sign of David Sehorn or any other DSNF medical official that I'd observed of approaching my cellroom door regarding to my (injured) pinky finger of my right hand.

149. And at that exact particular point, words could not express how very "upset" and "agitated" I was at Nurse Practitioner Rhonda Thompson.

150. Because, I waited and waited all that whole particular day for David Sehorn (or any other DSNF medical official) to come upstairs to unit 7-F to see about my (injured) pinky finger of my right hand.

151. Which, no one ever showed up at my cellroom door regarding to my injured pinky finger of my right hand.

152. David Sehorn never showed up at my cellroom door none that particular day or any other day after that.

153. I actually couldn't believe Nurse Practitioner Rhonda Thompson sat up there inside the "Treatment Team room" of unit 7-F and told me a "Huge" and "Gigantic" bold face lie.

154. However though, I should've known Nurse Practitioner Rhonda Thompson was lying to me from the very beginning inside the "Treatment Team room" on that particular day there.

155. Because, whenever it comes down to Nurse Practitioner Rhonda Thompson dealing with a segregated inmate that's on Maximum Security in unit 7-F or 7-C, Nurse Practitioner Rhonda Thompson is known as a very, very big "pathological" liar.

156. She's very "sneaky" and "deceitful" on so many levels.

157. Oneday, allegedly, Nurse Practitioner Rhonda Thompson even tried (in so many scandalous ways) to pretend like she completely forgot to follow my "conservator's order" when my conservator clearly instructed Nurse Practitioner Rhonda Thompson (by phone) to immediately cancel me ("Tyree Smith") from being medicated by the DSNF medical officials with an injection of "Haloperidol".

158. **Just like 99 percent of the DSNF Medical and "Mental Health" officials as well, so help me to God Almighty Nurse Practitioner Rhonda Thompson and David Sehorn are so very hypocritical.**

159. They are so "fake" and "phony".

160. Nurse Practitioner Rhonda Thompson and David Sehorn doesn't really have the inmate's best interest at heart.

161. Anyhow though, to make a long story short, hours later after I was escorted back to my cellroom from being evaluated by Nurse Practitioner Rhonda Thompson inside the "Treatment Team room" of unit 7-F on 4.5.12, that's when I went ahead and finally signed up on "sick call" again for the 2nd time regarding to my (injured) pinky finger of my right hand.

162. When I realized that David Sehorn wasn't coming upstairs to my cellroom door none of that particular day to see about my (injured) pinky finger of my right hand, that's when I really went ahead and signed up on "sick call" for the 2nd time, regarding to my (injured) pinky finger of my right hand.

163. But this time I was signed up on sick call by the "A-shift Nurse" of unit 7-F (4.5.12. Approx. 2:00 p.m. unit 7-F #110 cell DSNF).

164. However, but like I said, my pinky finger of my right hand was hurting very badly for about 15 days straight.

165. So, about 3 weeks to a month after those 15 particular days of my "pain and suffering" had ended, all of a (weird) sudden my pinky finger of my right hand started feeling very "vibrant"/"abnormal" after I not too long ago had finished exercising within my (assigned) cellroom.

166. And I can assure you, that particular weird feeling had nothing to do with "arthritis".

167. And right today, it is still very difficult for me to explain that very particular weird feeling that I felt in my pinky finger of my right hand.

168. It was a very "stigma" medical condition.

169. I thank God that it wasn't permanent though.

170. As a matter of fact, I even filed a prison complaint against (RMSI) Nurse Practitioner Lisa Jack at the RMSI institution for her refusing to appoint me to a "Occupational Therapist" regarding to my injury/that particular weird feeling of my pinky finger of my right hand.

171. So, therefore, at the end of the day, I hold C/O T. Perkins and C/O J. Champaco "Criminal Responsible" for the cause of the 3 physical injuries that I'd encountered during the physical altercation between Mr. Courtney Stroggins and I on 3.28.12..

172. However though, once again in cahoots, C/O T. Perkins and C/O J. Champaco had allowed 2 more other Maximum Security inmates/prisoners to engage into a "physical altercation" with each other inside the same rec. cage of unit 7-F at the DSNF institution.

**173. But first, upon information and belief:**

**174. A.** C/O T. Perkins and (former) C/O M. Spencer allowed Max Prisoner Michael Walker and Max Prisoner Ernest Fitzgerald to engage into a physical altercation with each other inside the same rec. cage (Approx. between 10.14.11 and 11.30.11 Approx. between 2:20 p.m. and 4:00 p.m. 2nd shift Unit 7-F rec. cage area DSNF).

**175. B.** (Former) Cpl. F. Estes and C/O T. Perkins allowed Max Prisoner Michael Walker and Max Prisoner Robert Hobson to engage into a physical altercation with each other inside the

same rec. cage (Approx. between 12.1.11 and 12.31.11    Approx. between 2:30 p.m. and 4:00 p.m. 2nd shift unit 7-F rec. cage area DSNF).

176. **C.** C/O T. Perkins and C/O J. Champaco allowed Max Prisoner Bruce Matthews and Max Prisoner Ernest to engage into a physical altercation with each other inside the same rec. cage (4.8.12  Approx. 2:45 p.m. 2nd shift unit 7-F rec. cage area DSNF).

177. **D.** And just for a bonus I guess, (former) Cpl. F. Estes and C/O S. Morris allowed Max Prisoner Demario Driver and Max Prisoner David Moore to engage into a physical altercation with each other inside the same rec. cage (Approx. between 6.1.11. and 7.31.11 Approx. between 2:30 p.m. and 4:00 p.m. 2nd shift unit 7-F DSNF).

178. Regarding to the four particular "Illegal Activities" that's outlined from number #174 to #177, those are my examples of a pattern of abuse (among other things) that took place within the DSNF institution.

179. **And there's no telling just how long exactly those particular "Illegal Activities" been going on within the DSNF institution as well?**

180. And those particular Max Prisoners that were fighting each other inside the rec. cage area wasn't just "ordinary" Max Prisoners, majority of those particular Max Prisoners are diagnosed with a "Mental Illness".

181. So, therefore, according to the Tennessee Department of Mental Health and substance abuse services in Nashville, those was some very serious and ultimate "Federal offenses" that the defendants committed within the DSNF institution.

182. And that's exactly one of the main reasons why I took the "initiative" upon myself to bring "Grievance Actions" and "Criminal Actions" against the 5 particular (Desperado) defendants of this civil case of their "Illegal Behavior" within the DSNF institution.

183. And all of a sudden now miraculously, C/O M. Spencer and Cpl. F. Estes had resigned (so gradually) away from the DSNF institution all of a sudden????

184. However though, upon information and belief, none of those 6 particular Max Prisoners (in all) that were involved in those 4 particular physical altercations with each other inside the rec. cage area from number #174 to #177 , none of those 6 particular Max Prisoners encountered no physical injuries.

185. All except, for Mr. Bruce Matthews.

186. Mr. Bruce Matthews was punched in the "Testicales" several times by Mr. Ernest Fitzgerald during their physical altercation between each other inside the rec. cage area..

187. **No matter how many "excuses" and "justifications" that the defendants that's involved in this civil case will try to come up with "in the long-run" to try to justify their "illegal**

behavior" within the DSNF institution, at the end of the day each and every single one of the defendants is (still) is as guilty as sin.

188. They are all guilty just like their (former) "co-worker" whose probably still going to court right now inside the Federal court for him and his (deceased) son for murdering those beautiful women several years ago in Nashville, Tennessee.

189. Which, within my mind I have absolutely no doubt that Montgomery and his son committed those particular heinous crimes.

190. And if anyone at this exact particular moment is wondering who I'm talking about, I'm talking about "Montgomery".

191. And there's no secret about it.

192. With all due respect to the courtroom, when Montgomery was a correctional officer at the DSNF institution, he use to "pretend" like he was so cool sometimes with the inmates.

193. But at the end of the day, Montgomery was a lowdown, grimy, wicked, crooked, sneaky "son-of-a-mitch" towards the inmates all over the unit 7 buildings.

194. Montgomery is a "Monster".

195. Montgomery has always been a Monster.

196. And that "employment" of his that he use to have at the TDOC, wasn't nothing but a "throw-off".

197. So, any time when you're looking at any of the defendants that's involved in this case, trust me, you're looking at a group full "Montgomerys" as well.

198. Especially, when it comes down all of them working inside of the unit 7 building of the DSNF institution.

199. And regarding to everything of what I'd just stated about Montgomery in this claim, if anyone has anything negative to say about me behind it, I can care less what anyone has anything negative to say about me behind it.

200. Because, it is what it is.

201. **This claim have "absolutely" and "positively" nothing to do with me trying to impress anyone.**

202. **Nor, being a "snitch" or a "sell-out" either.**

203. All I'm doing is just keeping it "one-hundred" and saying what's on my heart.

204. **I remember several times in the past when I use to be housed in unit 7-C, Montgomery use to treat me very lowdown inside unit 7-C of the DSNF institution.**

205. And the bad part about it, each time when those particular "matters" took place, Montgomery was one of the (assigned) pod officers of a different unit inside the unit 7 building.

206. In fact, Montgomery was one of the assigned pod officers of unit 7-B, and not unit 7-C..

207. So, therefore, I have absolutely no sympathy for the "predicament" that Montgomery has gotten his stupid self into.

208. **And whatever verdict that the jury "render" against Montgomery at the end of his trial, he truly deserve it as far as I'm concerned.**

209. Now, I truly wish that Montgomery doesn't get the "death penalty".

210. But, by any chance if he do get the death penalty, then it is what it is. Life goes on.

211. Cpl. F. Estes and C/O J. Champaco are very close friends of Montgomery.

212. Especially, Cpl. F. Estes.

213. All of those "monsters" need to be behind bars.

214. Suspension of the statute of limitation. A class action. A jury trial. Witnesses subpoenaed to court. A CHANGE OF VENUE. A criminologist. And a penologist.

215. Respectfully, on my behalf, I'm requesting for me to be granted those 7 particular things at number #214.

216. **Right now, I'm in the process of consulting with a very "prestigious" law firm that handle criminal and civil trials.**

217. The Municipality of Nashville Tennessee, the Tennessee Department of Correction, the Tennessee Correction Academy oughta be fully "responsible" and "liable" for the defendants' illegal actions within the TDOC prison system.

218. Although, at all times each of the defendants did in fact acted under "color of state law".

219. I'm requesting for the court to grant me "Compensatory" and "Punitive Damages" for the 3 physical injuries that I'd encountered physically.

220. So, therefore, I'm requesting to sue each of the defendants in each of their "Individual and "Official Capacity" on the behalf of all the plaintiffs that are involved within this civil case.

221. However, due to each of the defendants fixed income, I'm therefore is worry that the defendants doesn't have enough money that I'm requesting to be awarded of, for "Money Damages".

**222. See "Relief Requested" on page 27 of this claim.**

223. So, therefore, with all due respect to the Middle District Court, I'm requesting to the Middle District Court or to whomever else that this whole entire particular legal matter may concern as well, to order the Money damages that that I'm requesting of to be paid ("altogetherly") by the Municipality of Nashville Tennessee, the Tennessee Department of Correction, and the Tennessee Correction Academy for the 3 physical injuries that I'd encountered by Mr. Courtney Stroggins on 2.28.12.. **("Indemnification")**

224. A motion to dismiss. Objection. Appeal. Opposition. A motion of reconsideration. Summary Judgment. Declaration. Document Production. Interrogatories. Deposition Transcripts. And Inspecton.

225. I'm aware of all of those 11 particular "legal elements" at number #224.

226. Exactly 2 minimum or medium custody level inmates/prisoners at each "Temporarily" "or "Permanent" segregation housing unit of the **entire TDOC system** need to be so ordered by the Federal District Court for 2 minimum or medium (certified) custody level prisoners of whatever TDOC institution that the 2 minimum or medium custody level prisoners are current located at to observe the "interactions" at all times between the "TDOC staffs" and the "Max Prisoners" whenever any TDOC staff or an employee is "interacting" with a Max Prisoner(s).

227. Especially, whenever a Max Prisoner is being escorted to (or is already within) a secluded area from out the "visibility" of any of the "TDOC institution's cameras" that are installed within any of the institutions that are owned and/or operated by the TDOC.

228. The 2 minimum or medium custody level prisoners ("Trustees") should at all times be posted or walking within a distance of 10 feet away from the TDOC staffs and the Max Prisoner as the Max Prisoner is being escorted within any location of the TDOC institutions within it's entirety.

229. The 2 "Trustees" are also allowed (at any given time) to enter into an elevator (at the exact same time) with the TDOC staffs when the TDOC staffs are interacting and escorting a Max Prisoner to or from some other location within the institution.

230. At all times while the 2 trustees are "on duty" within any "Temporarily" or "Permanent" segregation housing unit of the TDOC where a Max Prisoner is located at, the 2 trustees must remain absolutely and completely "silent" whenever they are following a Max Prisoner being escorted by any TDOC staff or employee of the TDOC.

231. Under no circumstances none what's so ever, shall no TDOC staff member or employee of the TDOC shall have or be given the "authorization" or "seniority" to speak, laugh, converse, or "question" any of the 2 trustees while the 2 trustees are following the TDOC staffs as the TDOC staffs are escorting a Max prisoner somewhere.

232. The **ONLY** official of the TDOC that is allowed to "converse" or "question" any of the 2 trustees (while they're off or on duty), is a Top "TDOC prison official" whose occupational title is higher than an "Assistant Warden" occupational title.

233. Any "designee" of any of those type of top "TDOC prison officials" are totally unacceptable.

234. Unless, like I said, those particular top "TDOC prison officials" occupational title is higher than an "Assistant Warden" occupational title.

235. And there are absolutely "no exceptions" to any of the rules that I'd just outlined, none what's so ever.

236. Unless, there is a "serious" and a "real actual" safety hazard situation (and not a hoax) that is "imminent" within the institution that will leave the TDOC staff members no choice but to interact with the Max prisoners (to safety) without the "presents" and "observation" of the 2 trustees during that exact particular "emergency moment" that is taking place.

237. And then afterwards when the "emergency situation" had finally ended and to make very doggone sure that no "hoax" of an emergency within the institution wasn't plotted as well, a very "special agent" of the "Internal Affairs" will do a very "thorough investigation" to find out was there a "serious" and "real actual" safety hazard that really jeopardized the safety of the Max Prisoner's lives?

238. But other than those particular "theories" at number #236 and #237, a TDOC staff member or an employee of the TDOC is forbidden to interact with any Max Prisoner without the "present" and "observation" of 2 trustees.

239. Additional "trained" and "certified" trustees are required for as many as needed for any "Minor" or "Major" random cellroom search and/or "strip search" that is "conducted" by any TDOC staff member (or an employee) against any Max Prisoner of the TDOC, on any given day.

240. Any "necessary additional rules" regarding to this whole entire "Permanent Injunction" of mine that I truly feel that is needed and that will enhance the safety of a Max Prisoner while a Max Prisoner is serving his "time sentencing" on Maximum Security will be "instituted" by me personally.

241. Numbers from #227 to #231 of this civil claim, applies to the "Medical personnels" of the TDOC as well, whether if the Medical personnels are "contracted" by the TDOC or not.

242. The Medical personnels are only allowed to speak with any of the 2 trustees when it's a "medical-related" situation that's regarding strictly to any of the 2 certified trustees.

243. Any of the Medical personnels can not (under no circumstances) "question" any of the 2 trustees about another Max prisoner none what's so ever.

244. Especially, if it's a "medical situation".

245. If any of the medical personnels have any "medical concerns" about another Max Prisoner other than the trustees, the medical personnels can go and "question" that particular Max Prisoner for themselves instead of them "questioning" the trustees about that other particular Max Prisoner.

246. **And by all means necessary, even if the 2 trustees are "off duty", they are still "forbidden" to discuss, mention, or notify to any other inmate, staff, or any employee of the TDOC about what took (or what is currently taking place) on "this" or "that" "such" and "such" day inside any of the "Temporarily" or "Permanent" segregation housing units where any Max prisoner is housed at within any of the TDOC institutions.**

247. From number #226 to #246, that is my whole entire "Permanent Injunction" that I'm proposing to the Middle District Court, or to whomever else that this matter may concern as well.

248. **My Permanent Injunction is "legitimate" and "reasonable".**

249. **Allegedly, it will most certainly "reduce" and "prevent" any further possible problem of the "safety" and "federal rights" of the Maximum Security Prisoners for a very, very, very long time.**

250. **"Safety" is always first.**

251. The 6 particular "Illegal Activities" in all of this entire claim that's outlined, those 6 particular Illegal Activities (among other things) can be found on page 4 and 5 of my "unprocessed"/"unexhausted" prison complaint of mine that Sgt. Julia Campbell refused to process/exhaust through the DSNF grievance procedure when I'd mailed and proposed it to her through the U.S. mail from the RMSI institution on 11.8.12..

252. However, all of those particular "Illegal Activities" that's indicated inside of that particular prison complaint of mine that I'm speaking of (of number #251), all of those particular "Illegal Activities" are very similar of how other Maximum Security Prisoners (and other Prisoners in general) are being mistreated as well at other institutions of the TDOC in a very harsh, restrictive, unjust, racist, bias, and/or abusive "prison manner".

253. And the (so-call) Commissioner of the Tennessee Department of Correction ("Derrick Schofield"), refuses to anything about it either.

254. **Except for him making the Tennessee's "prison conditions" much, much worser than they already are ever since he ("Derrick Schofield") became commissioner.**

255. I even filed a prison complaint against Derrick Schofield as well when I was confined at the RMSI institution.

256. Allegedly, those particular "prison conditions" that I'm speaking of (of number #249), they also occurs at the T.W.P. and the C.C.A. facilities as well.

257. However, upon information and belief, the MCCX institution, the NECX institution, the BCCX institution, the DSNF institution, the TCIX institution, the BMCX institution, the NWCX institution, and the WTSP institution are "by-far" the most worse institutions of the TDOC.

258. Especially, the MCCX institution by all means.

259. And as far as it goes for the RMSI institution, upon information and belief, it was very "terrifying" and "horrible" of the "wrongful death" of Max Prisoner Mr. Jason Toll in unit 3 B-pod, at the RMSI institution in 2010.

260. Enclosed with this "proposed" federal civil claim of mine are copies of documents and written (authentic) witness statements of the plaintiffs that I hope that the court will take into "deep consideration" on my behalf of this claim.

261. **With every fiber of my being, I am so very serious about this whole entire civil case.**

262. The end.

263. Thank you.

264. May God bless.

------------------------------**End of claim**--------------------------

*A "Failure to Protect"/"Section 1983" violation*

*A "Federal Rights" violation*

*A "Equal Protection" violation*

**Defendants**

Mr. Marcus Wright #460159

Mr. Charles Nelson #370992

Mr. Tyree C. Smith #268325

Mr. Courtney Stroggins #370295

Mr. Michael Walker #427022

Mr. Ernest Fitzerald #446498

Mr. Robert Hobson #402758

Mr. Bruce Matthews #458505

Mr. Demario Driver #417678

Mr. David Moore #433008 (Deceased)

**Duly noted:**

Regarding to the defendants that are involved within this claim, fortunately I was able (through the internet) to finally discover the information of 2 of the defendants that are involved within this case ("C/O F. Estes and C/O J. Champaco").

Unfortunately, I was unable (through the internet) to discover the rest of the defendants' information, that are involved in this case.

So, therefore, the rest of the defendants of this case will have to be "summoned" at a later time, due to the help of my "future civil trial attorney".

However, Mr. Courtney, Mr. Charles Nelson, and myself are longer confided within the TDOC anymore.

Allegedly, the rest of the plaintiffs of this case are still confined within the TDOC.

**Duly noted:**

On 6.30.13, at the RMSI institution of unit #4 E-pod B-shift, most of my "personal property" that I brought with me from the DSNF institution to the RMSI institution was confiscated away from me by C/O K. Simmons and C/O A. Brown at the RMSI institution.

All of my white "underclothes" (including the new underclothes that I'd received at the RMSI institution), was all inside of that particular "personal property" of mine that C/O K. Simmons and C/O A. Brown confiscated away from me on 6.30.13..

However, within that particular "personal property" of mine that I'm speaking of, was the white T-shirt that I wore when Mr. Courtney Stroggins and I was engaging into a "physical altercation" with each other inside the rec. cage area at the DSNF institution on 3.28.12..

And at the lower part (on the right side) of that particular white T-shirt that I was wearing when Mr. Courtney Stroggins and I were engaging into a physical altercation with each other inside the rec. cage area at the DSNF institution on 3.28.12, a "fresh drop of blood" from the right side of my nostril of my "nose area" had landed at the lower part of that particular white T-shirt after the physical altercation had ended between Mr. Courtney Stroggins and I inside the rec. cage area at the DSNF institution on 3.28.12..

Eventually, that particular "fresh drop of blood" had left a "blood stain" on that particular white T-shirt of mine.

And by no means did I ever try to wash that particular white T-shirt.

Because, I already knew in the "long run" that I would probably need that particular white T-shirt for evidence of the "nosebleed" that I'd encountered by Mr. Courtney Stroggins on 3.28.12..

By all means, I tried my "darnest" to protect that particular white T-shirt of mine.

But, unfortunately like I'd said, C/O K. Simmons and C/O A. Brown had confiscated all of that particular personal property of mine that had that particular white T-shirt of mine inside of it.

So, therefore, I no longer have possession of that particular white T-shirt anymore.


**Relief Requested: Specify exactly what relief you are requesting against each defendant.**


**1.** For each and every single defendant to be "criminal prosecuted" and sentenced to incarceration for a very, very long time at the end of their trial.

**2.** For much, much more additional surveillance cameras (just to be safe) to be installed for each and every single "blind spot" that is not within the "visibility" of the surveillance cameras that are inside each and every institution of the TDOC while a Max prisoner is being escorted by any TDOC staff member or an employee, whether if there are trustees present or not.

**3.** For me to be awarded an amount of 3.3 million dollars in "money damages" for the 3 physical injuries that I'd severely encountered by Mr. Courtney Stroggins.

**4.** For my "Permanent Injunction" to be granted by the federal court, even though the TDOC officials (allegedly) will try absolutely everything in their power (of years to come) to try to get the federal court to terminate my "Permanent Injunction" once and for all, no matter how long it will take them to do so.

**Do you wish to request for a jury trial?** Definitely



Mr. Tyree C. Smith

829 Saxon Ave.

Mphs, Tn. 38126